1

**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
2   1530 PAGE MILL ROAD
PALO ALTO, CA 94304
3   TELEPHONE: (650) 251-1114
FAX: (650) 856-3710

4   DAVID B. MOYER, BAR NO. 197739
dmoyer@foley.com

5   **FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
6   3000 K ST., N.W.
WASHINGTON, DC 20007
TELEPHONE: 202.672.5300
7   FACSIMILE: 202.672.5399

LARRY L. SHATZER, *PRO HAC VICE*
8   lshatzer@foley.com
GEORGE C. BEST, *PRO HAC VICE*
9   gbest@foley.com
LIANE M. PETERSON, *PRO HAC VICE*
lpeterson@foley.com

10   ATTORNEYS FOR DEFENDANTS, INSMED
INCORPORATED, CELTRIX PHARMACEUTICALS,
11   INC., AND INSMED THERAPEUTIC PROTEINS, INC.

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                          OAKLAND DIVISION

15

16   GENENTECH, INC., a Delaware Corporation, )   Case No. C-04-5429-CW (EMC)
     TERCICA, INC., a Delaware Corporation    )
17                                             )   **STIPULATION GRANTING**
                Plaintiffs,                    )   **DEFENDANTS LEAVE TO AMEND**
18                                             )   **PRELIMINARY INVALIDITY**
          v.                                   )   **CONTENTIONS AND**
19                                             )   **[PROPOSED] ORDER**
     INSMED INCORPORATED, a Virginia          )
20   Corporation, and CELTRIX                  )
     PHARMACEUTICALS, INC., a Delaware         )
21   Corporation; INSMED THERAPEUTIC           )
     PROTEINS, INC., a Colorado Corporation.   )
22                                             )
                Defendants.                    )
23                                             )
     AND RELATED COUNTERCLAIMS                 )

24

25        WHEREAS, Defendants wish to amend their Preliminary Invalidity Contentions;

26        WHEREAS, a copy of Defendants' proposed Third Amended Preliminary Invalidity

27   Contentions is attached hereto (Tab A);

28

WASH_1520948.1

1    WHEREAS, on the terms and conditions stated in the attached letter of December 28,

2    2005 (Tab B), Plaintiffs do not object to the amendments of Defendants' Preliminary Invalidity

3    Contentions disclosed in the attached;

4    WHEREAS, Defendants agree not to seek to continue or alter the fact or expert discovery

5    schedule or re-depose individuals already deposed based on the new allegations raised in their

6    Third Amended Preliminary Invalidity Contentions;

7    IT IS HEREBY STIPULATED, by and between the parties hereto, through their

8    respective counsel, that Defendants may amend their Preliminary Invalidity Contentions as set

9    forth in the attached Third Amended Preliminary Invalidity Contentions.

10   DATED: JANUARY 9, 2006                        MCDERMOTT WILL & EMERY LLP

11

12                                                 BY_____/s/_____
                                                      WILLIAM G. GAEDE III
13                                                    ATTORNEYS FOR PLAINTIFF
                                                      TERCICA, INC.

14   DATED: JANUARY 9, 2006                        HELLER EHRMAN WHITE & MCAULIFFE
                                                   LLP
15

16                                                 BY_____/s/_____
                                                      M. PATRICIA THAYER
17                                                    ATTORNEYS FOR PLAINTIFF
18                                                    GENENTECH, INC.

19   DATED: JANUARY 9, 2006                        FOLEY & LARDNER LLP

20

21                                                 BY_____/s/_____
                                                      DAVID B. MOYER
22                                                    ATTORNEYS FOR DEFENDANTS AND
                                                      COUNTERCLAIMANTS INSMED
23                                                    INCORPORATED, CELTRIX
                                                      PHARMACEUTICALS, INC., AND
24                                                    INSMED THERAPEUTIC PROTEINS,
                                                      INC.

25

26

27

28

1    Concurrence in the filing of this document has been obtained from William G. Gaede III

2  and M. Patricia Thayer, the signatories listed above.

3  DATED: JANUARY 9, 2006                          FOLEY & LARDNER LLP

4

5                                          By_____/s/_____
                                              DAVID B. MOYER
6                                             ATTORNEYS FOR DEFENDANTS AND
                                              COUNTERCLAIMANTS INSMED
7                                             INCORPORATED, CELTRIX
                                              PHARMACEUTICALS, INC., AND
8                                             INSMED THERAPEUTIC PROTEINS,
                                              INC.
9

10

11

12      PURSUANT TO STIPULATION, IT IS SO ORDERED.
            1/11/06
13  Dated: _____          _____
                                              Hon. Claudia Wilken
14                                            United States District Judge

15

16

17                          GRANTED

18                          Claudia Wilken

19                       Judge Claudia Wilken

20

21

22

23

24

25

26

27

28

Tab A

1

**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
2  1530 PAGE MILL ROAD
PALO ALTO, CA 94304
3  TELEPHONE: (650) 251-1114
FAX: (650) 856-3710

DAVID B. MOYER, BAR NO. 197739
4  dmoyer@foley.com

5  **FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
3000 K ST., N.W.
6  WASHINGTON, DC 20007
TELEPHONE: 202.672.5300
FACSIMILE: 202.672.5399
7

LARRY L. SHATZER, *PRO HAC VICE*
8  lshatzer@foley.com
GEORGE C. BEST, *PRO HAC VICE*
gbest@foley.com
9  LIANE M. PETERSON, *PRO HAC VICE*
lpeterson@foley.com

10  ATTORNEYS FOR DEFENDANTS, INSMED
INCORPORATED, CELTRIX PHARMACEUTICALS,
11  INC. AND INSMED THERAPEUTIC PROTEINS, INC.

12

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                         OAKLAND DIVISION

16

17  GENENTECH, INC., a Delaware          )   Case No. C-04-5429 CW (EMC)
Corporation, GENENTECH, INC., a      )
Delaware Corporation                 )   **DEFENDANTS' THIRD AMENDED**
18                                       )   **PRELIMINARY INVALIDITY**
                                         )   **CONTENTIONS PURSUANT TO**
19           Plaintiffs,                 )   **PATENT L.R. 3-3**
                                         )
20         v.                            )
                                         )
21  INSMED INCORPORATED, a Virginia      )
Corporation, CELTRIX                 )
22  PHARMACEUTICALS, Inc., a Delaware    )
Corporation; INSMED THERAPEUTIC      )
PROTEINS, INC., a Colorado Corporation. )
23                                       )
                                         )
          Defendants.                    )
24                                       )
    AND RELATED COUNTERCLAIMS            )

25

26

27

28

                                    DEFENDANTS' THIRD AMENDED
                            PRELIMINARY INVALIDITY CONTENTIONS
                                 CASE NO. C-04-5429 CW (EMC)

WASH_1518558.1

1   Pursuant to Patent L.R. 3-3 of the United States District Court for the Northern District of

2   California, defendants Insmed Incorporated ("Insmed"), Celtrix Pharmaceuticals, Inc. ("Celtrix")

3   and Insmed Therapeutic Proteins ("ITP") (collectively "Defendants") hereby provide the

4   following Third Amended Preliminary Invalidity Contentions.  Defendants reserve the right to

5   supplement their Preliminary Invalidity Contentions as necessary based upon information

6   subsequently discovered or determined to be relevant.

7   In addition, Defendants anticipate that there will be claim interpretation issues that will

8   affect their Preliminary Invalidity Contentions.  At this time, Defendants' Preliminary Invalidity

9   Contentions take into account possible interpretations that the court might give to certain terms

10  of the asserted patents.

11  **A.     U.S. Patent No. 5,187,151**

12  **1.     Anticipating Prior Art under 35 U.S.C. § 102**

13  Pursuant to Patent L.R. 3-3(a), the following documents comprise anticipating prior art to

14  the asserted claims of U.S. Patent No. 5,187,151 ("the '151 patent") (claims 1, 4, 5 and 7) under

15  35 U.S.C. § 102(a):

16      1.      Maack et al., *Insulin-Like Growth Factor Binding Protein-3 Potentiates The*

17              *Effects of IGF-I in Rat and Pig Wound Healing Models*, 2nd International IGF

18              Symposium Abstract. (January 12-16, 1991). (claim 1)

19      2.      Sommer, *Molecular Genetics and Actions of Recombinant IGFBP-3*, 2nd

20              International IGF Symposium Abstract.  (January 12-16, 1991). (claims 1, 4, 5

21              and 7).

22  Pursuant to Patent L.R. 3-3(c), attached as Exhibit A are charts which specifically

23  identify where each claim element of claims of the '151 patent may be found in the disclosed

24  prior art.  The citations provided in these charts are representative of the teachings of the listed

25  references.  Defendants reserve the right to modify these charts by adding additional prior art

26  references to the extent such modification is appropriate in light of any additional information

27  gained through ongoing investigations or through discovery or in light of arguments made or

28

2

1     positions taken by Plaintiffs.

2     **2.      Obviousness Prior Art under 35 U.S.C. § 103**

3           Pursuant to Patent L.R. 3-3(a), the following documents comprise prior art that render the

4     asserted claims of the '151 patent obvious:

5           1.      Maack et al., Insulin-Like Growth Factor Binding Protein-3 Potentiates the

6                   Effects of IGF-I in Rat and Pig Wound Healing Models, 2nd International IGF

7                   Symposium Abstract.  (January 12-16, 1991).

8           2.      Sommer, *Molecular Genetics and Actions of Recombinant IGFBP-3*, 2nd

9                   International IGF Symposium Abstract. (January 12-16, 1991).

10          3.      WO 90/06950 (Spencer)

11          4.      WO 88/07863 (Spencer)

12          5.      EP 0369943 (Binkert)

13          6.      E. Martin Spencer, Editor, *Modern Concepts of Insulin-Like Growth Factors,*

14                  (Elsevier, 1991); Mueller et al., *The Role of IGF-I and IGFBP-3 in Wound*

15                  *Healing* at pages 185-192.

16          7.      E. Martin Spencer, Editor, *Modern Concepts of Insulin-Like Growth Factors,*

17                  (Elsevier, 1991), *Growth Hormone Receptor Deficiency (Laron Syndrome),*

18                  Rosenbloom, *et. al.*, pages 49-70.

19          Pursuant to Patent L.R. 3-3(b), Defendants hereby identify the following combinations of

20    prior art, and the motivation to combine such prior art, that render the asserted claims of the '151

21    patent obvious.

22          As discussed in detail in Defendants' Opposition to Plaintiffs' Motion for Preliminary

23    Injunction and in the accompanying Declaration of Christopher A. Maack, Ph.D., which are

24    incorporated herein by reference, the experiments described in Maack et al., *Insulin-Like Growth*

25    *Factor Binding Protein-3 Potentiates The Effects of IGF-I in Rat and Pig Wound Healing*

26    *Models,* 2nd International IGF Symposium Abstract ("Maack") and Sommer, *Molecular Genetics*

27    *and Actions of Recombinant IGFBP-3,* 2nd International IGF Symposium Abstract ("Sommer")

28

WASH_1518558.1

1   clearly render obvious the method disclosed in asserted claims 1, 4, 5 and 7 of the '151 patent.

2   Only two (Sommer) or three (Maack) elements of the claims are not expressly stated in the

3   Maack and Sommer abstracts. *See* Ex. B.  To the extent these elements are not implicit in the

4   references, each of these elements would have obvious to one of ordinary skill in the art.

5         Claim 4 requires that the method be used on a human. While the Maack and Sommer

6   abstracts relate to rat experiments, one of ordinary skill in the art at the time the application was

7   filed would have reasonably expected that the method could be applied to humans. Indeed, one

8   of ordinary skill would have understood that the purpose of these experiments was to obtain

9   results that could be extrapolated to humans, as the ultimate goal was not tissue growth and

10  wound healing in rats, but in humans.  The Sommer abstract references "clinical use," which one

11  of ordinary skill in the art would understand to mean humans and, thus, the element is expressly

12  disclosed by Sommer.  Furthermore, the only experimental data in the '151 specification are

13  from experiments on rats. D.I. 70-2, examples 1-3. Thus, the patent itself demonstrates that the

14  extrapolation from rats to humans was reasonably expected by one of ordinary skill at the time.

15        Motivation to practice the methods described in Maack and Sommer in humans can be

16  found in the general desire of those of ordinary skill in the art at the time to find ways to increase

17  the efficacy of IGF-I and IGFBP-3 in creating a greater anabolic state.  This desire is specifically

18  reflected in *Modern Concepts of Insulin-Like Growth Factors,* E. Martin Spencer, Editor

19  (Elsevier, 1991), *Growth Hormone Receptor Deficiency (Laron Syndrome),* Rosenbloom, *et. al.*,

20  at 66.  Specifically, this abstract states "[s]hould BP-3 not increase and be essential for growth

21  promotion, it could be administered simultaneously with the IGF-I in these patients", *citing*,

22  Sommer, *Molecular Genetics and Actions of Recombinant IGFBP-3*, 2nd International IGF

23  Symposium Abstract.

24        Disclosure of and motivation to practice the methods described in Maack and Sommer in

25  humans can be also be found in the following statement from  EP 0369943 (Binkert):

26          In accordance with the foregoing, IGF's may be useful in vivo to
        stimulate a) the growth of animals and **humans** with growth

27          hormone deficiency, b) tissue regeneration, such as erythropoiesis
        and chondrogenesis, c) wound healing and d) the functions of

28

4
DEFENDANTS' THIRD AMENDED
PRELIMINARY INVALIDITY CONTENTIONS
CASE NO. C-04-5429 CW (EMC)

various organs e.g., liver or kidney.  As a result of their chondrogenesis stimulating activity, IGFs are of particularly suitable use for bone formation, e.g. in the treatment of osteoporosis.  **IGFs for use in the above-referred treatments are advantageously administered to a subject in association with at least one IGF-binding protein.**

EP 0369943 at col. 2, lines 6-17 (emphasis supplied).

In addition, WO 90/06950 (Spencer) identifies various indications in which a complex of IGF and IGFBP-3 "would be useful" including "postmenopausal osteoporosis, other forms of osteoporosis, and human GH deficiency, as well as for healing wounds and increasing animal growth."  *Id.* at page 21, lines 20-28.  *See also*, WO 88/07863 (Spencer) at page 2, lines 23-26 and page 17, lines 2-7.

Claim 5 requires using human native-sequence, mature IGF-I.  Using human IGF-I would have been obvious to one of ordinary skill in the art because human IGFBP-3 was used in the complexes and one would normally assume that both molecules were of human origin if one was of human origin.  Use of heterologous complex of IGF-I and IGFBP-3 (*i.e.* composed of molecules from two different species) would be unusual and, therefore, specifically mentioned.  In fact, Spencer (WO 90/06950) refers to the therapeutic use of a *human* insulin-like growth factor in combination with an IGF binding protein.  *See* WO 90/06950 (Spencer) at page 21, lines 18-20.

Claim 7 requires the molar ratio of IGFBP-3 to IGF-I to be in the range of 0.8:1 to 1.5:1.  A ratio within this range (1:1) was used in the rat experiments, as confirmed in the paper *The Role of IGF-I and IGFBP-3 in Wound Healing* (the later published complete paper for the same rat experiments described in the Maack abstract).  This would have been obvious to one of ordinary skill in the art because of the use of the term "the IGF-I/IGFBP-3 complex".  A 1:1 ratio is indicated wherever the term "IGF-I/IGFBP-3 complex" is used without a specific ratio, because one molecule of IGFBP-3 can bind only one molecule of IGF-I.  This is also known as an equimolar complex.  Ratios other than 1:1 would produce molecular mixtures with some IGF-I/IGFBP-3 complex and either some free IGF-I (for ratios less than 1:1) or some free IGFBP-3

WASH_1518558.1

1   (for ratios greater than 1:1). Because IGFBP-3 is a molecule that is approximately 4 times larger

2   than IGF-I, a 1:1 ratio requires 4 times as much IGFBP-3 by weight as IGF-I. The paper *The*

3   *Role of IGF-I and IGFBP-3 in Wound Healing,* notes that "an equimolar complex" was used and

4   that a complex of 64 μg IGFBP-3 plus 16 μg IGF-I was most effective. This ratio matches the

5   definition of a 1:1 complex.

6        The claims at issue would be obvious even under the narrow interpretation of "anabolic

7   state" offered by Plaintiffs in their Motion for Preliminary Injunction. As noted above, the prior

8   art (Binkert, Spencer (WO 90/06950) and Spencer (WO 88/07863)) clearly suggests using the

9   complex of IGF-I and IGFBP-3 to stimulate growth and provides a motivation to combine these

10  references with Maack and/or Sommer. *See* Ex. C.

11       Pursuant to Patent L.R. 3-3(c), attached as Exhibit A, B and C are charts which

12  specifically identify where each claim element of the asserted claims of the '151 patent may be

13  found in the disclosed prior art references in combination with one or more of the other prior art

14  references, including the motivation for combining such prior art references discussed in more

15  detail above. To the extent necessary, the suggestion to combine the teachings of the various

16  prior art references listed in these charts is provided by the references themselves as filtered

17  through the knowledge of one skilled in the art and by the nature of the problem sought to be

18  solved by the '151 patent.

19       The citations provided in these charts are representative of the teachings of the listed

20  references. Defendants reserve the right to modify these charts by adding additional prior art

21  references to the extent such modification is appropriate in light of any additional information

22  gained through ongoing investigations or through discovery or in light of arguments made or

23  positions taken by Plaintiffs.

24       **3.    Failure to Comply with the Best Mode Requirement, 35 U.S.C. § 112**

25       The '151 patent is invalid because the patent's specification fails to "shall set forth the

26  best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. In

27  particular, the specification states that IGFBP-3 is the preferred IGFBP, col. 7, lines 27-28, and

28

6

DEFENDANTS' THIRD AMENDED
PRELIMINARY INVALIDITY CONTENTIONS
CASE NO. C-04-5429 CW (EMC)

1  that the recombinant IGFBP-3 used in the studies reported in the specification was "expressed in

2  mammalian cells," col. 10, line 4.  As Dr. Clark, one of the inventors of the '151 patent, testified

3  at his deposition, the glycosylation patterns of IGFBP-3 produced by different mammalian cell

4  lines varies.  Clark 12/19/05 Dep. Tr. at 139 (rough).  On information and belief, Genentech had

5  IGFBP-3 from both 293 and CHO cell lines before the '151 patent's filing date, and Dr. Clark

6  received material from these cell lines in 1990 or 1991, id. at 218-19.

7       Dr. Clark further testified that he performed experiments comparing the different

8  metabolic effects of IGFBP-3 derived from 293 cells and CHO cells.  Clark 12/20/05 Dep. Tr. at

9  17-18 (rough), and that it was well known in the field that proteins produced from different cell

10  lines would have different activities.  Clark 12/19/05 Dep. Tr. at 137-38.  The experiments using

11  the two different cell lines produced highly divergent results.  Specifically, the CHO derived

12  IGFBP-3 did not produce an anabolic effect different from that produced by free IGF-I alone,

13  while the 293 cell-derived material produced a greater anabolic effect than IGF-I alone, as

14  claimed in the '151 patent.

15       Thus, the '151 patent is invalid because it failed to disclose the inventors preferred source

16  of IGFBP-3.

17       **B.**   **U.S. Patent No. 5,258,287**

18            **1.**   **Obviousness Prior Art under 35 U.S.C. § 103**

19       Pursuant to Patent L.R. 3-3(a), the following documents comprise prior art that render

20  asserted claims 1-3, 6-9, 17-18 and 20 of U.S. Patent No. 5,258,287 ("the '287 patent") obvious:

21            1.   Suggs et al., Use of Synthetic Oligonucleotides as Hybridization Probes: Isolation

22                 of Cloned cDNA Sequences for Human $\beta_2$-microglobulin, Proc. Natl. Acad. Sci.,

23                 78(11): 6613-17 (1981) ("Suggs").

24            2.   Baxter et al., *Growth Hormone-Dependent Insulin-Like Growth Factor (IGF)*

25                 *Binding Protein from Human Plasma Differs from other Human IGF Binding*

26                 *Proteins*, Biochem. Biophys. Res. Commun., 139(3): 1256-61 (1986) ("Baxter

27                 I").

28

WASH_1518558.1

3.      Baxter et al., *Binding Proteins for Insulin-Like Growth Factors in Adult Rat Serum. Comparison with Other Human and Rat Binding Proteins*, Biochem. Biophys. Res. Commun., 147(1): 408-15 (1987) ("Baxter II").

4.      U.S. Patent No. 4,868,113 ("Jaye").

5.      Lathe, *Synthetic Oligonucleotide Probes Deduced from Amino Acid Sequence Data*, J. Mol. Biol., 183:1-12 (1985).

Pursuant to Patent L.R. 3-3(b), Defendants hereby identify the following combinations of prior art, and the motivation to combine such prior art, which render the asserted claims of the '287 patent obvious:

Baxter I and Baxter II teach the first 10 and 15 amino acids of IGFBP-3, respectively. Suggs, Jaye and Lathe disclose methods for isolating cloned DNA sequences that encode a particular protein. The Suggs, Jaye and Lathe methods involve constructing oligonucleotide probes from partial amino acid sequences, and using the oligonucleotide probes to screen a cDNA library that consists of cells that make the particular protein. Having knowledge of the partial IGFBP-3 amino acid sequences disclosed in Baxter I and II, it would have been obvious to one of ordinary skill in the art to use the methods described in Suggs, Jaye or Lathe to construct oligonucleotides from the partial IGFBP-3 amino acid sequences to probe a cDNA library to identify the DNA sequence depicted in Figure 3 of the '287 patent.

Jaye also discloses methods for preparing an expression vector capable of expressing the DNA sequence encoding a particular protein, transforming host cells with the expression vector, maintaining the host cells under conditions that permit expression of the DNA sequence to produce the particular protein, and recovering the protein from the host cells. Therefore, claims 17 and 18 of the '287 patent, which are directed to methods of producing the IGFBP-3 protein from host cells containing an expression vector comprising the DNA sequence of IGFBP-3 and recovering the expressed protein, are obvious in light of Jaye.

Pursuant to Patent L.R. 3-3(c), attached as Exhibit D is a chart which specifically identifies those portions of the disclosed prior art references that render the elements of the

WASH_1518558.1

1   asserted claims of the '287 patent obvious. To the extent necessary, the suggestion to combine

2   the teachings of the various prior art references listed in these charts is provided by the

3   references themselves as filtered through the knowledge of one skilled in the art and by the

4   nature of the problem sought to be solved by the '287 patent.

5        The citations provided in these charts are representative of the teachings of the listed

6   references. Defendants reserve the right to modify these charts by adding additional prior art

7   references to the extent such modification is appropriate in light of any additional information

8   gained through ongoing investigations or through discovery or in light of arguments made or

9   positions taken by Plaintiffs.

10          **2.      Grounds of Invalidity Based on Failure to Comply with the
                      Requirements of 35 U.S.C. § 112, first paragraph**
11

12       Pursuant to Patent L.R. 3-3(d), Defendants contend that asserted claims 1-3, 6-9 and 17-

13   18 of the '287 patent are invalid for failure to comply with the requirements of 35 U.S.C. § 112,

14   first paragraph.

15              **a.      Insufficient Written Description**

16       The asserted claims of the '287 patent are invalid because the specification of the '287

17   patent lacks a written description sufficient to show that Plaintiffs had possession of what they

18   now claim as their invention.

19       Specifically, claim 1 of the '287 patent is directed to a genus of DNA molecules that

20   hybridize to the sequence depicted in Figure 3 at specified conditions. The specification does not

21   contain any disclosure or description of the structure of any such DNA molecules, other than the

22   sequence depicted in Figure 3 itself. The specification discloses only one species of DNA

23   molecule of the claimed genus (depicted in Figure 3), which is insufficient to put one of skill in

24   the art in possession of the attributes and features of all species within the claimed genus.

25              **b.      Lack of Enablement**

26       The asserted claims of the '287 patent are invalid for lack of enablement because the

27   specification of the '287 patent does not teach one skilled in the art how to practice the claimed

28

1    invention.

2           Specifically, the specification does not enable all DNA molecules which would hybridize

3    to the DNA of Figure 3 under the conditions set forth in claim 1 of the '287 patent and encode an

4    IGFBP-3 protein that binds to IGF-I or IGF-II.  While hybridization under the claimed

5    conditions may be considered routine, it would require undue experimentation to identify all

6    DNA sequences encompassed by claim 1 of the '287 patent.  In addition, the specification does

7    not indicate which amino acids of the IGFBP-3 sequence are essential for binding to IGF-I or

8    IGF-II.  Accordingly, it would require undue experimentation to create variants of the sequence

9    depicted in Figure 3 that would encode proteins that still bind to IGF-I or IGF-II.

10          Should the Court adopt Plaintiffs' proposed claim construction of the phrase "hybridizes

11   under stringent conditions," as submitted in the Joint Claim Construction Statement filed on

12   October 14, 2005, claim 1 of the '287 patent and the claims that depend from claim 1 are invalid

13   for lack of enablement on additional grounds.  Specifically, Plaintiffs' proposed construction

14   leaves out the step of washing the filters used in the hybridization experiment.  Without washing

15   the filters it is not possible for one of ordinary skill in the art to ascertain whether or not they

16   have the isolated DNA molecule required.  The patent contains no teaching as to how one of

17   ordinary skill in the art could make a judgment as to whether any particular DNA sequence

18   hybridizes to the DNA of Figure 3 without washing the filters under the conditions set forth in

19   the specification.  Further more the claim requires the use of hybridization conditions that are

20   sufficiently stringent to exclude hybridization by DNA encoding certain sequences that were

21   know in the prior art.  If Tercica's claim construction were correct and the claim does not require

22   any particular set of wash conditions, a competitor would not be able to determine the scope of

23   the claim without extensive experimentation.

24                          c.    **Indefiniteness**

25          Should the Court adopt Plaintiffs' proposed claim construction of the phrase "hybridizes

26   under stringent conditions," as submitted in the Joint Claim Construction Statement filed on

27   October 14, 2005, claim 1 of the '287 patent and the claims that depend from claim 1 are invalid

28

WASH_1518558.1

1   as indefinite as they do not "particularly point [] out and distinctly claim [] the subject matter

2   which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2.  Specifically, Plaintiffs'

3   proposed construction leaves out the step of washing the filters used in the hybridization

4   experiment.  Without washing the filters it is not possible for one of ordinary skill in the art to

5   ascertain the scope of the claim so as to determine whether or not they would infringe the claim.

6   Furthermore, the claim requires the use of hybridization conditions that are sufficiently stringent

7   to exclude hybridization of DNA encoding certain sequences that were known in the prior art.  If

8   Tercica's claim construction were correct and the claim does not require any particular set of

9   wash conditions, a competitor would not be able to determine the scope of the claim without

10  extensive experimentation.

11              **3.      Incorrect Inventorship, 35 U.S.C. § 102(f)**

12          Named inventor Dr. Robert Baxter did not make a material contribution to the conception

13  of any of the claims of the '287 patent.  At his deposition, the only allegedly inventive

14  contribution that Dr. Baxter could identify was his laboratory's ability to perform tests that

15  allegedly verified the activity of IGFBP-3 cloned and expressed at Genentech.  Baxter Dep. Tr.

16  at 66-86 (rough).  Because Genentech's entire business model was based upon the expression of

17  active proteins, it is inconceivable that Dr. Wood did not start his collaboration with Dr. Baxter

18  with the express goal of producing active protein.  Performance of routine tests is not an

19  inventive contribution.  *See, e.g., Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d

20  613, 624 (Fed. Cir. 1985).

21          The '287 patent is therefore invalid because it incorrectly identifies Dr. Baxter as an

22  inventor.

23          **C.      U.S. Patent No. 6,331,414**

24              **1.      Grounds of Invalidity Based on Failure to Comply with the
                        Requirements of 35 U.S.C. § 112, first paragraph**

25

26          Pursuant to Patent L.R. 3-3(d), Defendants contend that asserted claims 1-4 and 9-10 of

27  U.S. Patent No. 6,331,414 ("the '414 patent") are invalid for failure to comply with the

28

WASH_1518558.1

1    requirements of 35 U.S.C. § 112, first paragraph.

2

3                    **a.    Insufficient Written Description**

4            As set forth in more detail in Defendants' Opposition to Plaintiffs' Motion for

5    Preliminary Injunction, which is incorporated herein by reference, the asserted claims of the '414

6    patent are invalid because the specification of the '414 patent lacks a written description

7    sufficient to show that Plaintiffs had possession of what they now claim as their invention.

8            Specifically, the '414 patent specification contains no written description for claims

9    encompassing expression of a completely heterologous fusion protein in an prokaryotic host

10   organism. Each example of *E. coli* expression of IGF-I in the '414 patent involves expression of

11   a fusion protein consisting of IGF-I combined with a bacterial protein. *See* D.I. 70-3, col. 13, ln.

12   16 – col. 16, ln. 19. Articles describing the rationale for using the fusion protein approach also

13   taught away from the use of a completely heterologous fusion protein. D.I. 77-8 at 23; D.I. 77-8

14   at 51. In view of the knowledge of those of ordinary skill as of the filing date of the '414 patent

15   application, the skilled artisan would not understand the disclosure as encompassing expression

16   of a heterologous/heterologous fusion protein. Indeed, the specification's description does not

17   include such proteins. Rather, the specification expressly limits the fusion protein expression

18   process to a homologous/heterologous polypeptide. *Id.*, col. 2, ln. 65 – col. 3, ln. 6.

19                    **b.    Lack of Enablement**

20           As set forth in more detail in Defendants' Opposition to Plaintiffs' Motion for

21   Preliminary Injunction, and the accompanying Declarations of Christopher A. Maack, Ph.D and

22   Andreas Sommer, Ph.D., which are incorporated herein by reference, the asserted claims of the

23   '414 patent are invalid for lack of enablement because the specification of the '414 patent does

24   not teach one skilled in the art how to practice the claimed  invention.

25           Specifically, the '414 patent specification fails to demonstrate (1) how to make mature

26   IGF-I; (2) how to recover a mature, biologically active protein from bacterial cell culture; (3)

27   how to cleave an IGF-I fusion protein to obtain a correctly folded, biologically active, human

28

WASH_1518558.1

IGF-I; (4) how to produce hIGF in all prokaryotic host cells; or (5) how to fusion partners other than the trp bacterial gene. Neither the specification, nor any subsequent information supplied to the PTO by Genentech, shows that IGF-I, produced in a prokaryote using the claimed methods, has biological activity.

Moreover, at the time of filing, there were tremendous difficulties in developing IGF expression systems that could successfully produce IGF-I. *See* Humbel, *Insulin-Like Growth Factors I and II*, Eur. J. Biochem., 190: 445-461 (1990) ("Humbel"), at 457. The '414 patent's specification describes some of the problems associated with recombinant production of proteins:

> The general means and methods are in hand for the in vitro ligation of various blunt ended or "sticky" ended fragments of DNA, producing potent expression vehicles useful in transforming particular organisms, thus directing their efficient synthesis of desired exogenous product. However, on an individual product basis, the pathway remains somewhat tortuous and the science has not advanced to a stage where regular predictions of success can be made. Indeed, those who portend successful results without the underlying experimental basis, do so with considerable risk of inoperability.

D.I. 70-3, col. 2, ll. 38-48.

The specification further notes the poor biological activity of fusion proteins:

> In the latter cases [of fusion proteins], the intended bioactive product is sometimes rendered bio-inactive within the fused, homologous/heterologous polypeptide until it is cleaved in an extracellular environment.

*Id.*, col. 3, ll. 2-6.

Issues of protein degradation and incorrectly folded polypeptides also were common. In fact, even after the priority date of the '414 patent, difficulties persisted in the production of recombinant IGF-I. *See e.g.*, Humbel at 457; Peters et al., *Expression of a Biologically Active Analogue of Somatomedin-C/insulin-like growth factor I*, Gene, 35: 83-89 (1985) ("Peters"), at 83-84; Hejanes et al., *Development of an Optimized Refolding Process for Recombinant Ala-Glu-IGF-1*, Protein Eng'g, 5(8): 797-806 (1992) ("Hejanes"), at 797.

1        Claims 1-4 of the '414 patent encompasses, at least, direct expression of IGF-I in

2  prokaryotes in the absence of a fusion partner. Nevertheless, the teachings in the specification do

3  not describe direct expression and production of a mature hIGF in any prokaryote. The working

4  examples for prokaryotes are limited to expression of an IGF-I fusion protein. The state of the art

5  at the time of filing was such that protein degradation in prokaryotic systems presented a

6  significant obstacle, especially in the absence of a fusion partner. D.I. 77-8 at 51-52. Moreover,

7  IGF-I folding continues to be an arduous task. Many eukaryotic proteins synthesized in bacteria

8  fold incorrectly and/or inefficiently and consequently, exhibit little or no biological activity.

9  Additionally, production of authentic, biologically active eukaryotic proteins from cloned DNA

10  frequently requires post-translational modifications. For IGF-I, the most important of these

11  modifications is formation of the correct disulfide bonds.

12        Assuming, for the sake of argument, that IGF-I produced by direct expression, as

13  described in the '414 patent specification, is not degraded and is recovered from culture, the

14  correct protein conformation and intramolecular disulfide bonding of recombinantly produced

15  proteins was not immediately apparent in 1983. Given the state of the art at the time of filing, the

16  unpredictability of the art and the nature of the invention, one skilled in the art could not have

17  reasonably assumed that the recombinantly-produced IGF-I was correctly folded and biologically

18  active, without demonstration of pharmacological/biological activity.

19        Claims 1-4 and 9-10 (if construed to also encompass production of human IGF-I from a

20  fusion protein) are not enabled because the specification does not teach how to isolate the IGF-I

21  from the inclusion bodies formed by expression of the fusion protein.

22        The '414 patent specification describes cloning an IGF-I fusion protein into a vector,

23  transforming *E. coli*, and recovering the heterologous protein as refractile bodies in the pellet.

24  Beginning on column 13, line 19, a process for attempting expression of pNCV-IGF-I and

25  pNCV-sLE-IGF-I is described. Both clones comprise a DNA sequence coding for a fusion

26  protein with a recognition site for collagenase. D.I. 70-3, col. 13, ll. 38-56.

27        The specification then describes solubilizing a trp-IGF fusion protein in Guanidine-HCl,

28

1   D.I. 70-3, col. 16, ll. 5-16, and assaying the fusion protein by the radioimmunoassay (RIA)

2   procedure described in Furlanetto *et al.*, (1977), *J. Clin. Invest.*, 60:648. *Id.*, col. 16, ll. 13-16

3   ("Furlanetto").  The examples, however, do not teach how to recover a biologically active

4   heterologous protein from refractile bodies.

5           Recovery of a protein from refractile bodies has presented numerous problems, including

6   separating the protein from the cellular material and other proteins in the environment and

7   recovering the inclusion body protein in biologically active form. The recovered protein may be

8   biologically inactive because it is folded into a three-dimensional conformation which is

9   different from that of the active protein.  Importantly, prokaryotes generally do not fold disulfide

10  bonds properly because they lack the organelles that facilitate this process. Difficulties

11  associated with refolding proteins expressed in the form of inclusion bodies are well-known, and

12  "[t]he *E. coli* expression system rarely results in the formation of renatured correctly folded IGF-

13  I." Hejanes, at 797 (emphasis supplied).  Misfolding occurs either in the cell during fermentation

14  or during the isolation procedure.  *Id.*

15          Due to the complexity of the refolding process, refolding protocols have been designed to

16  break incorrect disulfide bonds, to block random disulfide bonding, and to allow refolding and

17  correct disulfide bonding under conditions favorable to the formation of active conformation.

18  Such protocols teach how to recover a desired protein from a refractile body and how to restore,

19  if necessary, a protein's biological activity. These methods were developed after the priority date

20  of the instant application, however.  *See, e.g.*, Hejanes, at 797.

21          Therefore, without functional testing of the IGF-I fusion protein, one cannot assume that

22  the protein made by the claimed process was correctly folded into the appropriate conformation.

23  Indeed, given the many problems that were known in the art, with respect to obtaining properly

24  folded proteins from bacteria, the skilled artisan would not have expected the fusion proteins to

25  have biological activity. The RIA method disclosed in the '414 patent is not a functional assay.

26          In addition, claim 9 of the '414 patent recites the release of "mature human IGF-I."  The

27  '414 specification does not provide data demonstrating successful cleavage of IGF-I from a

28

WASH_1518558.1

1   fusion partner or even guidance on how to cleave the fusion protein to release mature hIGF-I.

2   Nor do the working examples disclose how to carry out such a step.  The '414 specification also

3   fails to teach procedures that would follow the cleavage step, such as processing and renaturing

4   steps, which are required to obtain a biologically active product.

5         Accordingly, the specification is insufficient with regard to the manufacture of correctly

6   folded and biologically active proteins. "While every aspect of a generic claim need not have

7   been carried out by an inventor, or exemplified in the specification, reasonable data must be

8   provided in order to enable members of the public to understand and carry out the invention."

9   *Genentech Inc., v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997). In the instant case, a

10   skilled artisan would not be able to make and use the present invention absent guidance for

11   processing and refolding a recombinantly produced IGF-I protein. Notably, the specification fails

12   to establish that any of the exemplified IGF-I fusion proteins were processed correctly, renatured

13   correctly, or were biologically active.

14         Claims 1, 3-4 and 9-10 of the '414 patent all recite production of hIGF with a prokaryotic

15   host cell transformed with a replicable expression vector.  Yet the '414 specification only

16   describes the use of *E. coli* hosts.  The specification fails to provide any guidance for

17   determining which other prokaryotes can be used in the claimed methods.  Given the problems of

18   protein degradation associated with proteases endogenous to the recombinant host, the

19   generalization that IGF-I will not be degraded in all prokaryotes if it is not degraded in *E. coli*,

20   can not be made.  Not all prokaryotic hosts or even all bacterial cells are suitable for recombinant

21   IGF-I production.  For example, different proteases are present in different hosts, and therefore

22   one host may degrade a particular protein while another host may not.  As cited in the

23   prosecution history of the '414 patent, the art is replete with failures in recombinant IGF-I

24   expression.  *See* D.I. 77-8 at 51-52..  Given the nature of the invention, state of the art, and

25   unpredictability in the art, the '414 patent is not enabling for recombinant expression of IGF-I in

26   all prokaryotes.

27         Claims 1-4 and 9-10 (if construed to also encompass production of human IGF-I from a

28

WASH_1518558.1

1  fusion protein) are not enabled because the specification does not disclose suitable fusion

2  partners other than the trp bacterial protein. *See* D.I. 70-3, col. 13, ll. 38-41. Because the

3  process for producing IGF-I in prokaryotes was highly unpredictable at the time of filing, the

4  quantity of experimentation needed to make or use the claimed invention would be undue. In

5  addition, because the specification is not enabling for all bacterial proteins as suitable IGF fusion

6  partners, the specification is certainly not enabling for any amino acid sequence exogenous to

7  hIGF as a suitable fusion partner. *See* D.I. 77-5, at 25 ("[T]he specification does not describe

8  production . . . of IGF-I or IGF-II fused to a yeast protein."). Given the lack of guidance or

9  working examples regarding bacterial fusion proteins other than trp, much less fusion proteins of

10  non-bacterial origin, it would require undue experimentation to determine which fusion proteins

11  could be used to express IGF-I in a prokaryotic host.

12
13
         **2.**      **Grounds of Invalidity Based on Failure to Comply with the
Requirements of 35 U.S.C. § 101**

14        Defendants contend that asserted claims 1-4 and 9-10 of the '414 patent are invalid for

15  lack of utility under 35 U.S.C. § 101.

16        The '414 patent describes the IGF-I proteins produced according to the claimed methods

17  as useful for treating "human beings for various growth associated conditions or diseases." D.I.

18  70-3, col. 3, lines 43-45. Thus, the biological activity of the IGF-I proteins produced according

19  to the claimed methods determines the utility of those methods. Testing and verifying the

20  biological activity of the IGF-I proteins would be necessary for the same reasons described

21  above. Due to the problems associated with protein degradation and incorrect folding, one

22  skilled in the art would not be able to assume that IGF-I produced according to the '414 patent

23  would have biological activity.

24        The '414 patent, however, fails to provide evidence of biological activity of the expressed

25  IGF-I proteins. The '414 patent only describes assaying the IGF-I proteins with the Furlanetto

26  RIA procedure. D.I. 70-3, col. 16, lines 5-16. A RIA indicates interactions between an antigen

27  and an antibody, but does not measure pharmacological activity. Because the IGF-I proteins

28

WASH_1518558.1

1   produced according to the claimed methods were not shown to be useful for their intended

2   function, the invention(s) claimed in the '414 patent lack a substantial and credible utility under

3   35 U.S.C. § 101.

4

5

    DATE: JANUARY 9, 2006                    _____

6                                                   Larry L. Shatzer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                                            18
                                                        DEFENDANTS' THIRD AMENDED
                                                  PRELIMINARY INVALIDITY CONTENTIONS
                                                       CASE NO. C-04-5429 CW (EMC)

Tab B

# McDermott Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.

William G. Gaede III
Attorney at Law
wgaede@mwe.com
650.813.5035

December 28, 2005

VIA FACSIMILE (202) 672-5399

George C. Best, Esq.
Foley & Lardner LLP
3000 K Street, NW, Suite 500
Washington, DC 20007

Re:    Genentech v. Insmed, et al.

Dear George:

I write in response to your letter of Friday, December 23 requesting our consent to defendants
amending their Local Rule invalidity contentions a third time.  We do not agree with your
assertion that defendants could not have pled these allegations at an earlier time under the Local
Rules.  Discovery has been open since April and you have had the relevant documents for
several months.  Indeed, for example, the purported issue concerning the production of IGFBP-3
in 293 cells and Cho cells has been the subject of Insmed's discovery and unfounded inequitable
conduct allegations since at least October, and such documents were provided to Insmed well
before that.  Your attempt to justify your delay on Dr. Clark's recent deposition, addressing the
same underlying subject matters, is unfounded.  Indeed, the only logical conclusion is that you
held back defendants' "new" best mode allegations to attempt to surprise Dr. Clark at his
deposition.

Likewise, Dr. Baxter and Dr. Wood's laboratory notebooks on the alleged new inventorship
issue have also been in your possession for several months.  You did not seek to schedule Dr.
Clark's or Dr. Baxter's depositions until November and you have not diligently complied with
your obligation to disclosed in a timely manner defendants' contentions, which were due last
July.

We do not believe you have complied with either the letter or the sprit of the local rules.  Further,
today is the last day we may propound written discovery before the fact discovery cut-off of
January 27, 2006.  Thus, this last minute and tardy request is prejudicial to plaintiffs.

Given all of the above, we are well within our rights to refuse this amendment.  However, if you
agree that defendants will not seek to continue or alter the fact or expert discovery schedule

George C. Best, Esq.
December 28, 2005
Page 2

based on these tardy allegations or re-depose individuals already deposed, we will consent.
Please confirm.

Very truly yours,

William G. Gaede III

WGG/bah

cc:   Ms. Patricia Thayer

MPK 102261-1.073241.0011