1    MCDERMOTT WILL & EMERY LLP
     WILLIAM G. GAEDE, III (136184)
2    wgaede@mwe.com
     ANDREW A. KUMAMOTO (178541)
3    akumamoto@mwe.com
     DAVID L. LARSON (112342)
4    dlarson@mwe.com
     3150 Porter Drive
5    Palo Alto, CA 94304-1212
     Telephone:    (650) 813-5000
6    Facsimile:    (650) 813-5100

7    *Attorneys for Tercica, Inc.*

8    HELLER EHRMAN LLP
     M. PATRICIA THAYER (90818)
9    patricia.thayer@hellerehrman.com
     ETHAN C. GLASS (216159)
10   ethan.glass@hellerehrman.com
     333 Bush Street
11   San Francisco, CA  94104-2878
     Telephone:    (415) 772-6794
12   Facsimile:    (415) 772-6268

13   *Attorneys for Genentech, Inc.*

14                 UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                     OAKLAND DIVISION

17   GENENTECH, INC., a Delaware              No.  C-04-5429 CW (EMC)
     Corporation, TERCICA, INC., a Delaware
18   Corporation,                            **PLAINTIFFS' NOTICE OF MOTION
                                             AND MOTION FOR PARTIAL
19                  Plaintiffs,              SUMMARY JUDGMENT AND
            v.                               COMBINED BRIEF FOR CLAIM
20                                           CONSTRUCTION AND PARTIAL
     INSMED INCORPORATED, a Virginia         SUMMARY JUDGMENT**
21   Corporation, CELTRIX
     PHARMACEUTICALS, INC., a Delaware
22   Corporation, and INSMED THERAPEUTIC     Date:      May 19, 2006
     PROTEINS, a Colorado Corporation,       Time:      10:00 a.m.
23                                           Courtroom: 2
                    Defendants.
24                                           Honorable Claudia Wilken
25   AND RELATED COUNTERCLAIMS.

26                            *PUBLIC VERSION*

27

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION .............................................................................................. 1
II.   SUMMARY OF FACTS ................................................................................... 3
      A.    Background on the Technology ........................................................... 3
      B.    The Asserted Patents Arise out of Genentech's Pioneering IGF-I Research .......... 4
      C.    The Accused Process for Making Mature Human IGF-I ..................... 4
III.  CLAIM CONSTRUCTION .............................................................................. 5
      A.    The Two Primary '414 Patent Claim Construction Disputes Essential to
            Plaintiffs' Partial Summary Judgment Motion .................................... 6
            1.    Claim 1 Encompasses Both Fusion and Direct Expression ........... 6
            2.    The "Exogenous" Limitation of Claim 9 Encompasses Any Fusion
                  Partner Not Endogenous to the Human IGF-I Amino Acid
                  Sequence ...................................................................................... 9
      B.    The Two Primary '151 Patent Claim Construction Disputes ............... 12
            1.    The "Produce a Greater Anabolic State" Element of Claim 1 Covers
                  Only the Systemic Anabolic Conditions of Total Body Weight or
                  Statural Growth ........................................................................... 12
            2.    The "Greater Anabolic State in a Mammal Than That Achieved
                  Using An Equivalent Dose of IGF-I Alone" Element in the Context
                  of the Intrinsic Record Requires That the Same Dosing Regimen
                  and Amount of IGF-I Be Compared ............................................ 14
            3.    Secondary '414 and '287 Patent Claim Construction Issues ........ 17
                  a.    Defendants' Attempt to Read in Additional Limitations of
                        "Processing, Folding and Disulfide Bond Formation" Into
                        the '414 Patent Claims is Improper ..................................... 17
                  b.    The "Hybridizes, Under Stringent Conditions" Limitation of
                        Claim 1 in the '287 Patent Does Not Require Intent to
                        Exclude Hybridization to DNA Encoding IGFBP-1 ............ 17
                  c.    The "BP53 Protein is Human" Limitation of Claim 6 in the
                        '287 Patent is not Limited to Figure 3 ............................. 18
            4.    Claim Construction Issues Not Relevant To Infringement, Validity,
                  or Enforceability ......................................................................... 18
IV.   SUMMARY JUDGMENT ............................................................................... 19
      A.    Motion for Summary Judgment of the '414 Patent That Defendants'
            Process for Making IPLEX™ Literally Meets Every Element of Process
            Claims 2 and 9 .................................................................................. 19
      B.    Motion for Summary Judgment of No Invalidity on the '151 Patent That
            The Maack and Sommer 1991 Abstracts Are Not Prior Art Under Section
            102(a) Since the Inventions Asserted Were Reduced to Practice Before
            Their Publication ............................................................................... 20
            1.    In September 1990 Genentech Reduced To Practice the Inventions
                  Embodied in the Specification's Examples I and III ................... 21
            2.    Defendants Cannot Make a Clear and Convincing Showing on the
                  Essential Element That The Maack and Sommer Abstracts Qualify
                  as Section 102(a) Prior Art .......................................................... 23
V.    CONCLUSION .............................................................................................. 25

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1

**TABLE OF AUTHORITIES**

2

**Page**

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

3   **CASES**

4   *Burroughs Wellcome Co. v. Barr Lab. Inc.*
    40 F3d 1233 (Fed. Cir. 1994) ............................................................................ 24
5
    *C.R. Bard, Inc. v. U.S. Surgical Corp.*
6   388 F.3d 858 (Fed. Cir. 2004) ........................................................................... 16

7   *Cytologix Corp v. Ventana Med. Sys., Inc.*
    424 F.3d 1168 (Fed. Cir. 2005) ........................................................................... 5
8
    *Eli Lilly & Co. v. Barr Lab., Inc.*
9   222 F.3d 973, 980 (Fed. Cir. 2000) ............................................................ 20, 23

10  *Engelhardt v. Judd*
    369 F.2d 408 (C.C.P.A. 1966) ........................................................................... 24
11
    *General Mills, Inc. v Hunt-Wesson*
    103 F.3d 978 (Fed. Cir. 1997) ........................................................................... 19
12
    *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*
13  381 F.3d 1111 (Fed Cir. 2004) ....................................................................... 5, 6

14  *Interactive Gift Express, Inc. v. Compuserve, Inc.*
    256 F.3d 1323 (Fed. Cir. 2001) ........................................................................... 5
15
    *Johnson Worldwide Assoc. v. Zebco Corp.*
16  175 F.3d 985 (Fed. Cir. 1990) ........................................................................... 12

17  *Loral v. Matsushita*
    266 F.3d 1358 (Fed. Cir. 2001) ......................................................................... 23
18
    *Mahurkar v. C.R. Bard, Inc.*
    79 F.3d 1572 (Fed. Cir. 1996) ..................................................................... 21, 24
19
    *Markman et al. v. Westview Instruments, Inc.*, et al.
20  517 U.S. 370 (1996) ............................................................................................ 6

21  *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*
    347 F.3d 1367 (Fed. Cir. 2003) ................................................................... 24, 25
22
    *Micro Chemical Inc. v. Great Plains Chemical Co.*
23  103 F.3d 1538 (Fed. Cir. 1997) ................................................................... 24, 25

24  *Phillips v. AWH Corp.*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................... 5, 6, 7
25
    *Phonometrics, Inc. v. Northern Telecom Inc.*
26  133 F.3d 1459 (Fed. Cir. 1998) ......................................................................... 19

27  *SanDisk Corp. v. Memorex Prod., Inc.*
    415 F.3d 1278 (Fed. Cir. 2005) ......................................................................... 16

28  *Scott v. Finney*
    34 F.3d 1058 (Fed. Cir. 1994) ........................................................................... 24

**TABLE OF AUTHORITIES**
**(continued)**

Page

*SlipTrack Sys., Inc. v. Metal -Lite, Inc.*
   304 F.3d 1256 (Fed. Cir. 2002) ........................................................................................... 21

*Southwall Techs., Inc. v. Cardinal IG Co.*
   54 F.3d 1570 (Fed. Cir. 1995) ............................................................................................... 6

*SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985) (en banc) ........................... 19

*Vitronics Corp. v. Conceptronics, Inc.*
   90 F.3d 1576 (Fed. Cir. 1996) .............................................................................. 5, 10, 12, 16

*Vivid Technologies, Inc. v. American Science & Engineering, Inc.*
   200 F.3d 795 (Fed. Cir. 1999) ............................................................................................. 18

**STATUTES**

35 U.S.C. § 102(a) ................................................................................................... 1, 2, 21, 23

**RULES**

Fed. R. Civ. P. 56(c) ............................................................................................................ 19

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

iii

**PLEASE TAKE NOTICE** that on May 19, 2006, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 2 of the above-entitled Court, Plaintiffs Tercica, Inc. ("Tercica") and Genentech, Inc. ("Genentech") (collectively "Plaintiffs") will, and hereby do, move this Court for an order: (1) granting partial summary judgment that Defendant Insmed Incorporated ("Insmed") and Defendant Insmed Therapeutic Proteins ("ITP") literally infringe Claims 2 and 9 of U.S. Patent No. 6,331,414 (the "'414 Patent"); (2) granting partial summary judgment that U.S. Patent No. 5,187,151 (the "'151 Patent") is not invalid in view of the January 1991 Maack and Sommer abstracts; and (3) adopting Plaintiffs' constructions for the disputed claim terms of the '414 and '151 Patents, and U.S. Patent No. 5,258,287 (the "'287 Patent").  This motion is based upon this Notice of Motion, Motion and Memorandum of Points and Authorities, the Declaration of William G. Gaede, III, ("Gaede Decl."), the Declaration of Deborah Mortensen, ("Mortensen Decl."), the prosecution histories for the '414, '151 and '287 Patents, the First and Second Expert Reports of Charles T. Roberts ("1st Roberts Rpt," "2nd Roberts Rpt"), the First and Second Expert Reports of Leonard P. Guarente ("1st Guarente Rpt," "2nd Guarente Rpt"), the Expert Report of Keith Backman ("Backman Rpt"), the Joint Claim Construction Statement, the pleadings and records on file, the arguments and evidence presented at the hearing, including any tutorials, and such other and further evidence as may be presented to the Court.

The requested relief for partial summary judgment is supported by two key facts:   (i) Defendants Insmed and ITP literally infringe Claims 2 and 9 of the '414 Patent under the proper claim construction by making IPLEX™ in the United States; and (ii) the January 1991 Maack and Sommer abstracts do not qualify as prior art under 35 U.S.C. § 102(a) to the four asserted claims of the '151 Patent because the subject matter of those claims was reduced to practice prior to the abstracts' publication.

## I.  INTRODUCTION

Defendants attempted for years to license the three asserted patents from Genentech at considerable sums.  Ultimately, however, Genentech chose to license its patents to Tercica.  Faced with the consequences of not having a license, Defendants now proffer constructions that read in limitations, disregard clear statements in the prosecution history, or read out clear lexicographic

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1  definitions – all in violation of the fundamental principle that claims are to be given their ordinary

2  meanings in light of the public intrinsic record.

3        Turning to Insmed's and ITP's literal infringement of Claims 2 and 9 of the '414 Patent,

4  resolution of that issue turns on two claim construction issues.

5  Whether in Claim 1 (upon which Claim 2 depends) the Court should adopt:

6      • The ordinary meaning of "expressing" the human IGF-I protein as encompassing both
7        fusion and direct expression, a meaning both the Examiner and the Applicants
      acknowledged during prosecution; or

8      • Defendants' construction that narrows the claim by reading in a limitation to direct
9        expression.

10  Whether in Claim 9 the Court should adopt:

11      • The ordinary meaning of "exogenous," which encompasses any source of amino acids
      other than the endogenous human IGF-I amino acid sequence, a meaning again
12        endorsed by the Examiner; or

13      • Defendants' construction that narrows the claim by reading in a limitation to
      prokaryotes.

14  Resolving these two construction issues in favor of Plaintiffs is dispositive of the motion for partial

15  summary judgment of literal infringement.

16        Plaintiffs further move for partial summary judgment of no invalidity of the '151 Patent on

17  Defendants' anticipation and obviousness defenses based on the January 1991 Maack and Sommer

18  abstracts. The undisputed evidence is that the asserted '151 Patent inventions disclosed in

19  Examples I and III of the Patent were reduced to practice by September 1990, antedating and

20  thereby negating the abstracts' use as prior art under Section 102(a). Moreover, with respect to the

21  '151 Patent, there are two primary claim construction issues that bear on Defendants' attempt to

22  make relevant the Maack and Sommer abstracts and avoid literal infringement:

23      • Whether in Claim 1 the specification's lexicographic definition of "producing an
      anabolic state" as promoting "total body weight gain" or "statural growth" governs, or
24        whether Defendants' effort to broaden the construction of anabolic state to encompass
      all cellular growth, no matter how small or how local, applies. The law and the
25        intrinsic record support Plaintiffs' construction and are contrary to Defendants'
      position.
26

27      • Whether in Claim 1 the dosing regimen and amounts of the IGF-I must be the same, or
      whether any dosing regimen and amounts may be used, as Defendants contend.
      Again, the intrinsic record is contrary to Defendants' position.
28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

2

1    Accordingly, Plaintiffs request (1) that the ordinary meaning of the claim terms in light of

2 the intrinsic record be adopted, and (2) that partial summary judgment be granted of (a) literal

3 infringement of Claims 2 and 9 of the '414 Patent, and (b) no invalidity of the asserted '151 Patent

4 claims in view of the Maack and Sommer abstracts.

5 **II.    SUMMARY OF FACTS**

6       **A.    BACKGROUND ON THE TECHNOLOGY**

7    In humans, growth hormone ("GH") stimulates the production of insulin-like growth

8 factor ("IGF-I"), which then stimulates statural growth and increases whole-body, lean tissue mass.

9 For children that grow poorly, typically GH is used to treat them. However, a small number of

10 these children with "Severe Primary Insulin-Like Growth Factor Deficiency" ("Severe Primary

11 IGFD") do not respond to GH growth therapy because GH does not stimulate IGF-I production in

12 their bodies. These patients typically increase statural growth if they are given an IGF-I based

13 therapy.

14    IGF-I also has "insulin like" effects. For example, if too much free IGF-I is present in the

15 body, it can cause hypoglycemia (low blood sugar) which, if severe enough, can lead to death. The

16 body naturally modulates the level of free IGF-I by means of binding proteins that form a complex

17 with IGF-I. The predominant IGF-I binding protein is called "IGFBP-3." The IGF-I and the

18 IGFBP-3 associate together (like two magnets) into an IGF-I/IGFBP-3 complex. This complex has

19 a longer half-life – *i.e.*, circulates in the blood longer – than uncomplexed IGF-I, and reduces free

20 IGF-I's insulin-like effects. The IGF-I/IGFBP-3 complex acts, in effect, as a reservoir from which

21 the body draws "free" IGF-I to stimulate growth.

22    There are two approved products for administering IGF-I to treat Severe Primary IGFD

23 patients: (i) Tercica's Increlex™ product comprising "free" IGF-I; and (ii) Insmed's IPLEX™

24 product comprising IGF-I complexed to IGFBP-3. The Food and Drug Administration ("FDA")

25 approved Increlex™ on August 27, 2005, and IPLEX™ on December 12, 2005. Both drugs treat

26 the same Severe Primary IGFD population of approximately 6,000 U.S. children.

27

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

**B.   THE ASSERTED PATENTS ARISE OUT OF GENENTECH'S PIONEERING IGF-I RESEARCH**

In 1983, Genentech began to develop a therapeutic IGF-I program. Genentech scientists were the first to recombinantly produce the IGF-I protein in bacteria, the first to recombinantly make IGFBP-3, and the first to show that complexed IGF-I/IGFBP-3 delivered systemically under the skin via a "subcutaneous bolus injection" could be used as a therapy to induce an anabolic effect, *i.e.*, to increase statural growth and lean body mass.

The Patent and Trademark Office ("PTO") rewarded Genentech's innovations with a series of patents, three of which are asserted here:

- The '414 Patent generally covers Defendants' process for the recombinant production of the human IGF-I component in IPLEX™. (Attached hereto as Appendix A.)

- The '151 Patent generally covers IPLEX™'s administration to improve statural growth in Severe Primary IGFD patients by creating a greater whole body "anabolic state" than IGF-I alone had it been administered following the same protocol and dosing regimen. (Attached hereto as Appendix B.)

- The '287 Patent generally covers the DNA encoding for and methods of making the IGFBP-3 protein component in IPLEX™. (Attached hereto as Appendix C.)

**C.   THE ACCUSED PROCESS FOR MAKING MATURE HUMAN IGF-I**

Defendants Insmed's and ITP's accused process for producing mature human IGF-I is laid out in detail in Insmed's New Drug Application ("NDA") documents filed with the FDA to obtain approval for IPLEX™.[1] By way of background, there are two ways to express (produce) in *E. coli* the IGF-I polypeptide of interest: (1) as a fusion protein, in which the IGF-I amino acid is fused or attached to other amino acid sequence(s); and (2) directly without fusion or attachment to other amino acid sequences. (*See generally*, 1st Guarente Rpt, ¶¶ 8-19 for additional background.)

*\* REDACTED - CONTAINS CONFIDENTIAL INFORMATION OF DEFENDANTS \**

---

[1] The chart attached hereto as Appendix E compares each element or step of Claims 2 and 9 of the '414 Patent with Defendants' method of making mature human IGF-I. This chart shows that Defendants' method of making the mature human IGF-I used in IPLEX™ meets every element of method Claims 2 and 9 of the '414 Patent.

PLTFFS' OPENING CLAIM CONSTRUCTION AND PARTIAL SUMMARY JUDGMENT BRIEF CASE NO. C-04-5429 CW (EMC)

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1

*REDACTED - CONTAINS CONFIDENTIAL INFORMATION OF DEFENDANTS *

2

3

4

5

6

7

8

9

10 **III.    CLAIM CONSTRUCTION**

11        Claim construction is a question of law and "follow[s] the methodology set forth in [the]

12 recent *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)."

13 *Cytologix Corp v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) "It is a 'bedrock

14 principle' of patent law that the 'claims of a patent define the invention to which the patentee is

15 entitled the right to exclude'." *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v.*

16 *Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed Cir. 2004)); *see also Vitronics*

17 *Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the

18 claims themselves . . . to define the scope of the patented invention"). The analytical focus begins

19 with and remains centered on the language of the claims themselves. *See Interactive Gift Express,*

20 *Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). The claim language provides

21 substantial guidance as to the meaning of a disputed claim term. *See Phillips*, 415 F.3d at 1314.

22        The ordinary meaning of claim language as understood by a person of skill in the art may

23 be readily apparent even to lay people because the term "involves little more than the application of

24 the widely accepted meaning of commonly understood words." *Id.* at 1314. In cases where the

25 meaning of the term is not commonly understood to lay people, the court looks to a variety of

26 sources that would also be available to the public, namely "words of the claims themselves, the

27 remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1  scientific principles, the meaning of technical terms, and the state of the art."[2]  *Id.* (quoting

2  *Innova/Pure Water*, 381 F.3d at 1116).

3      However, "undue reliance on extrinsic evidence poses the risk that it will be used to

4  change the meaning of claims in derogation of the 'indisputable public records consisting of the

5  claims, the specification and the prosecution history,' thereby undermining the public notice

6  function of patents." *Id.* at 1319 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570,

7  1578 (Fed. Cir. 1995)).  In contrast, undue reliance on the intrinsic evidence must be tempered by

8  "one of the cardinal sins of patent law -- reading a limitation from the written description into the

9  claims." *Id.* at 1320.  The *Phillips* court opined that this sin could be avoided by distinguishing

10  between words that **restrict** the invention to a specific description, from words that **exemplify** how

11  to practice an invention. *Id.* at 1323.

12  **A.    THE TWO PRIMARY '414 PATENT CLAIM CONSTRUCTION DISPUTES ESSENTIAL**
          **TO PLAINTIFFS' PARTIAL SUMMARY JUDGMENT MOTION**

13

14      **1.    Claim 1 Encompasses Both Fusion and Direct Expression**

15      Claim 1 recites a process for expressing human IGF-I that encompasses both fusion and

    direct expression.                              ***REDACTED***

16

17              ***REDACTED - CONTAINS CONFIDENTIAL INFORMATION OF DEFENDANTS ***

18  ***REDACTED***   However, Claim 1 contains no language limiting it to direct expression:

19          1.    A process for producing human IGF-I comprising preparing a
          replicable expression vector capable of ***expressing*** the DNA sequence

20          encoding human IGF-I in a prokaryotic host cell, transforming a
          prokaryotic host cell culture with said vector to obtain a recombinant

21          host cell, culturing said recombinant host cell culture under conditions
          permitting ***expression*** of said human IGF- I-encoding DNA sequence

22          to produce human IGF-I, and recovering said human IGF-I.

23  (Appendix A, col. 29:24-32 (emphasis added).)  Claim 1 uses the general term "expression" that

24

_____

25  [2] Defendants likely will raise the greatly circumscribed principle of construing claims to preserve
    validity because their experts have rendered opinions in this regard.  This doctrine has been

26  marginalized by *Markman*, and the Federal Circuit *en banc* recently stated that this "doctrine of
    limited utility" only applies when "the court concludes, after applying all the available tools of

27  claim construction, that the claim is still ambiguous." *Phillips*, 415 F.3d at 1327. Should the Court
    consider such evidence, Plaintiffs refer the Court to the entire Backman Rpt; the 2nd Guarente Rpt,

28  ¶¶ 25, 38, 44, 58-61, Exs. 11 & 14; and the 2nd Roberts Rpt, ¶¶ 195-99, Exs. 59, 144-146, for
    rebuttal on Defendants' invalidity contentions.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1   Plaintiffs' and Defendants' experts agree a person of ordinary skill in the art understands to

2   encompass both fusion and direct expression.  (1st Guarente Rpt, ¶ 54; Gaede Decl., Ex. 5 at pp.

3   79:25-80:3.)

4         Consistent with this ordinary meaning, during prosecution both the Examiner and the

5   Applicants acknowledged that Claim 1 encompasses both fusion and direct expression of human

6   IGF-I.  The Examiner initially raised enablement issues directed to the fusion expression species of

7   pending Claim 5, which issued as Claim 1.  (Stipulated File History of U.S. Patent No. 6,331,414

8   ("SFH '414") Tab 4 at pp. 7-9.)  The Examiner then raised an enablement issue on the Claim's

9   direct expression species, recognizing that aspect of the Claim's scope:

10        **In addition,** claims 5 and 21 encompass **direct expression** of IGF-I
          and IGF-II in prokaryotes in the absence of a fusion partner.

11

12  (SFH '414, Tab 4 at p. 9 (emphasis added).)  In response, Applicants confirmed that they shared the

13  Examiner's interpretation of pending Claim 5 (issued Claim 1) as encompassing both fusion and

    direct expression of human IGF-I:
14

15        The Examiner also urges that **claims 5** and 21 **encompass direct
          expression of human IGF-I** and IGF-II in prokaryotes, **as well as
16        fusion** proteins and secreted proteins, with no guidance provided.

17  (SFH '414, Tab 8, *see generally* pages 15-18 (emphasis added).)  Applicants never narrowed the

    claim to exclude fusion expression and eventually pending Claim 5 issued as Claim 1.
18

19        The remainder of the intrinsic record confirms the prosecution history's unequivocal

20  statements.  First, Claim 1's lack of recitation of a particular manner of expression (*i.e.*, direct or

    fusion) should be contrasted to Claims 5 and 9, both of which expressly reference species of
21

22  "fusion" expression.  The express use of the term "fusion" to limit Claims 5 and 9 demonstrates

23  that the drafters specified the mode of expression when intended.  By contrast, Claim 1 lacks

    specific language limiting the genus of expression to "direct" or "fusion" expression.[3]  *See Phillips,*
24

25

26  [3]Claim 3 provides further support that Claim 1 encompasses both fusion and direct expression of
    human IGF-I.  (Appendix A, col. 29:35-36.)  Claim 3 depends on Claim 1 and recites that the IGF-I
27  is recovered from a refractile body.  The specification of the '414 Patent exemplifies that inclusion
    bodies are typically the product of the fusion expression and that human IGF-I as a fusion protein is
28  recovered from these bodies, proving further support that Claim 1 properly includes fusion
    expression.  (*See* 2nd Guarante Rpt, ¶¶ 14, 15 and 23.)

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1   415 F.3d at 1314 (other claims useful in understanding particular claim terms).

2       Second, the specification uses the term "direct expression" to describe that narrower

3   meaning:

> In practice, the use of recombinant DNA technology can express
> entirely heterologous polypeptides – *so-called direct expression* – or
> alternatively may express a heterologous polypeptide fused to a
> portion of the amino acid sequence of a homologous polypeptide.

(Appendix A, col. 2:65 – 3:2 (emphasis added).)  Thus, the Applicants were aware that the term

"direct expression" signified a form of expression and they used the term when they intended to

distinguish from fusion expression.

10      Third, the '414 Patent specification discloses two embodiments exemplifying (1)

expression of human IGF-I protein as a fusion protein that can be selectively cleaved, (2)

preparation of a DNA construct specifically designed to permit selective cleavage of the fusion

protein, (3) subsequent confirmation that the expressed fusion protein expressed contained the

human IGF-I protein, and (4) the art-adopted custom of referring to such fusion expression as

expressing the target protein of interest, *i.e.*, "to obtain expression of IGF-I as a fusion protein."

(Appendix A, col. 13:16-56 and 16:2-19, Figures 7 & 8; 1st Guarente Rpt, ¶¶ 59-61; 2nd Guarente

Rpt, ¶ 16.)

18      Collectively, the claim language, the clear statements in the prosecution history, and the

specification's terminology all show that Claim 1 covers both direct and fusion expression.

Ignoring the compelling intrinsic record, Defendants argue that because Claim 1 uses the language

"human IGF-I," the process is limited to directly expressing that protein.  But, Claim 1 is *not*

directed to a composition.  Rather, it is directed to a process containing specified elements that

result in "recovery" of the human IGF-I amino acid sequence in any form, *e.g.*, as a fusion protein,

as a cleaved product that is recovered, or as a product recovered directly.  The claim language does

not limit the process to a specific kind of expression, and such an interpretation is belied by the

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

PLTFFS' OPENING CLAIM CONSTRUCTION AND
PARTIAL SUMMARY JUDGMENT BRIEF
CASE NO. C-04-5429 CW (EMC)

1    ordinary meaning, the prosecution history and the rest of the intrinsic record.[4]

2                   **2.    The "Exogenous" Limitation of Claim 9 Encompasses Any Fusion
                    Partner Not Endogenous to the Human IGF-I Amino Acid Sequence**

3

4          Claim 9 recites the production of a fusion protein comprising human IGF-I fused at the N-

5    terminus to amino acid sequences "*exogenous*" thereto.  Under the "bedrock principle" that the

6    claims define the invention, Claim 9 limits those sequences in no way other than that the fused

7    sequences must be "exogenous" to the "endogenous" IGF-I amino acid sequence.

8          A person of ordinary skill in the art in June of 1983 would have understood that

9    "exogenous" refers to an amino acid sequence of an origin outside of the endogenous human IGF-I

10   protein.  This exogenous sequence(s) could come from any source, *i.e.*, eukaryotic, synthetic,

11   prokaryotic, or a combination thereof.  (*See* 1st Guarente Rpt, ¶¶ 66-84.)  Defendants' experts

12   concede that the term "exogenous" usually does not convey a specific source for the amino acids

13   and encompasses anything outside of that which is "endogenous." (Gaede Decl., Ex. 5, p. 115:16-

14   22; Gaede Decl., Ex. 9, pp. 195:22 – 197:6.)

15              *\* REDACTED - CONTAINS CONFIDENTIAL INFORMATION OF DEFENDANTS \**

16             *\* REDACTED\**                    (*See* Section IV. A, *infra*.)  To try to avoid

17   literal infringement, Defendants therefore offer a tortured construction:  They contend that the

18   "exogenous" amino sequences in the human IGF-I fusion protein are limited to "a domain with an

19   amino acid sequence taken from a prokaryotic cell."[5]  Defendants' attempt to avoid the ordinary

20   meaning of "exogenous" by reading in a "prokaryotic" (*e.g.*, bacterial) limitation is contrary to the

21   intrinsic record.

          First, Claim 9 contains no such language:

22

23             9.    A process for producing mature human IGF-I comprising culturing
                    a recombinant prokaryotic host cell, transformed with a replicable

24   _____

25   [4] Defendants' experts argue that Plaintiffs offer multiple and expanding constructions of "human
     IGF-I."  That is not true, and their misapprehension rests on wrongly conflating the amino acid
26   sequence of human IGF-I, with recovering it in a particular state, *e.g.*, as a fusion protein, existing
     alone, or cleaving it.  (*See* 2nd Guarente Rpt, ¶¶ 8-11, 14-19, 24, 39-41; Gaede Decl., Ex. 6 at
27   69:23-71:17.)

     [5] Defendants' experts subsequently opined that the words "a domain with" need not be included in
28   the definition, stating a construction of "exogenous" as "an amino acid sequence *taken from a
     prokaryotic cell*." (Gaede Decl., Exs. 7 and 8, 1st Burgess Rpt, ¶ 36; 1st Maack Rpt, ¶ 61.)

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

> expression vector capable of expressing in a suitable host cell a DNA sequence encoding a *fusion protein comprised of human IGF-I fused at the N-terminus of the IGF-I <u>to amino acid sequence exogenous</u> to human IGF-I*, under conditions permitting expression of the DNA sequence, and cleaving the fusion protein to release mature human IGF-I having the proper amino terminus (gly).

(Appendix A, col. 30:25-34 (emphasis added).)

Second, had Plaintiffs intended to limit Claim 9 to prokaryotic or bacterial fusion partners, they would have used that language. By contrast, they did so limit Claim 5 by identifying the fusion partner amino acid sequence as taken from a "*bacterial protein*." (Appendix A, col. 30:3-5.) In contrast, Claim 9 uses different and broader language to describe the scope of the fusion partner, *i.e.*, an "amino acid sequence *exogenous* to human IGF-I."

Third, the specification teaches and exemplifies embodiments that further support Plaintiffs' construction of "exogenous." At Columns 13 through 16, two expression constructs are described that express a cleavable IGF-I fusion protein in *E. coli* and that do not have *a sequence taken from a prokaryotic protein directly fused at the N-terminus of the IGF-I protein*, as Defendants' construction requires. (Appendix A, col. 13:15-16:19, Figures 7 and 8.) Rather, for example, exemplified is a fusion protein comprising an amino acid sequence of 13 amino acids from the TrypLE bacterial protein fused to a synthetic five amino acid sequence created by Genentech scientists:



Defendants' construction would exclude this preferred embodiment because it discloses a synthetic construct not taken from a prokaryotic source directly attached to the N-terminus of IGF-I. *See Vitronics*, 90 F.3d at 1583 (construction that excludes a preferred embodiment is rarely correct).

Fourth, the prosecution history confirms that "exogenous" simply means "from a source outside of" the IGF-I sequence. The Examiner characterized the claim scope of "exogenous to human IGF-I" as encompassing "*<u>any fusion partner</u>*" and never limited this claim element to a

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

PLTFFS' OPENING CLAIM CONSTRUCTION AND
PARTIAL SUMMARY JUDGMENT BRIEF
CASE NO. C-04-5429 CW (EMC)

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

1  specific source for the fusion partner. (SFH '414, Tab 4 at p. 10.) Conversely, the Examiner

2  required Genentech to limit Claim 5 to "bacterial protein" fusions, *but imposed no such*

3  *requirement on Claim 9*, leaving the exogenous language undisturbed. Ultimately, Claim 9 was

4  properly allowed with the original claim language of "amino acid exogenous to human IGF-I."

5       Faced with this unequivocal intrinsic record, Defendants fall back on two arguments.

6  Defendants' experts agree with Plaintiffs' reading of the prosecution history, but speculate that the

7  Examiner should have limited Claim 9 as he did with Claim 5. (Gaede Decl., Ex. 20, 2nd Maack

8  Rpt, ¶ 83.) This allegation does nothing to change the public prosecution history, which reflects an

9  understanding of the claim scope consistent with the ordinary meaning of "exogenous." More

10 importantly, Claim 5 is of a different scope and contains other limitations. In particular, Claim 5

11 contains the requirements that the host cell be "capable" of "processing" the fusion protein

12 produced. (Appendix A, col. 30:10-12.) Such limitations are not present in Claim 9, and account

13 for the different claim scope that the Examiner allowed.

14      Finally, Defendants rely heavily on a "background" paragraph to limit the claim. There,

15 the specification states that one "may express a heterologous polypeptide fused to a portion of a

16 homologous polypeptide." (Appendix A, col. 2:11-27 to 3:22.) That homologous/heterologous

17 language (a) differs from the chosen "exogenous" Claim 9 language, (b) is a non-limiting

18 exemplification in the background to the invention that one "may" use, and (c) does not purport to

19 be, and could not be, a complete representation of the state of the art as of the June 1983 priority

20 date because it relies on a 1979 and a 1980 publication discussing fusion expression work

21 performed in 1977. (*See* 2nd Guarente Rpt, ¶¶ 50-51, Exs. 35 and 36; Backman Expert Rpt, ¶¶ 31-

22 33.)

23      In sum, Claim 9's express and ordinary meaning, the specification, and the prosecution

24 history's statement that the claim encompasses "any fusion partner" all confirm the correctness of

25 Plaintiffs' construction.

26

27

28

**B.    THE TWO PRIMARY '151 PATENT CLAIM CONSTRUCTION DISPUTES**

**1.    The "Produce a Greater Anabolic State" Element of Claim 1 Covers Only the Systemic Anabolic Conditions of Total Body Weight Gain or Statural Growth**

The specification defines "producing an anabolic state" as "promoting" "total body weight gain" or "statural growth." (Appendix B, col. 6:43-45.)  Casting aside the specification's clear lexicographic language, Defendants construe the phrase to mean "characterized by or promoting constructive metabolism," *i.e.*, any "anabolism" that occurs in a single cell, or in a single local area, such as wound healing.   (Appendix D, p. 3; Gaede Decl., Ex. 1, 1st Spencer Rpt, ¶ 30.) Defendants' construction, advanced to try to make relevant the non-analogous and non-material wound healing art, lacks merit.

At the outset, Claim 1 does not use the term "constructive metabolism":

> 1.    A method for ***producing an <u>anabolic state in a mammal</u>*** comprising co-administering to the mammal by subcutaneous bolus injection effective amounts of IGFBP-3 and IGF-I in a molar ratio of IGFBP-3 to IGF-I of about 0.5:1 to about 3:1 so as to ***produce a greater <u>anabolic state in the mammal</u>*** than that achieved using an equivalent dose of IGF-I alone, wherein growth hormone is not also administered to the mammal.

Instead, it addresses producing in "the" mammal an "anabolic state," thereby conveying a systemic or whole body condition. (1st Roberts Rpt, ¶ 81.)

The Applicants confirmed this scope in the specification by acting as their own lexicographer to define "producing an anabolic state" as "promoting total body weight gain" or "statural growth," thereby excluding Defendants' molecular or local anabolisms constructions:

> As used herein, the words ***"producing an anabolic state" refer to promoting total body weight gain as well as the dynamics of statural growth*** experienced by an individual during infancy, childhood, and adolescence as depicted by a normal growth curve, *i.e.*, growth of linear-producing bone plate driven by chondrocytes, as well as growth of osteoblast cells, derived from a different part of the bone. Restoration of normal growth patterns would allow the patient to approach a more satisfactory growth curve.

(Appendix B, col. 6:43-68 (emphasis added).)  This lexicographic definition is binding as a matter of law. *Vitronics*, 90 F.3d at 1582; *Johnson Worldwide Assoc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1990) (where patentee has chosen to be his or her own lexicographer by defining a claim

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1   term, that definition controls over the term's ordinary meaning).

2       Defendants understood perfectly well that this lexicographic definition controlled before

3   this litigation. In obtaining their own Patent, U.S. Patent No. 5,643,867 (the "'867 Patent"),

4   Defendant Celtrix, Defendants' Chief Science Officer Dr. Andreas Sommer, and Defendants'

5   current expert, Dr. Christopher Maack, represented to the PTO that:

6           *[the '151 Patent] defines 'anabolic state' as an increase in 'total
7           body weight as well as the dynamics of statural growth.'"*

8   (1st Roberts Rpt, ¶ 91, Ex. 20 at p. 6; 2nd Roberts Rpt, ¶ 40.)

9       The specification is consistent in this regard. For example, each of the three examples

10  embodying the inventions show only a whole body systemic use consistent with the specification's

11  definition. (*See* Appendix B, col. 9:30-13:10; 1st Roberts Rpt, ¶ 89; 2nd Roberts Rpt, ¶ 29.) Had

12  Patentees intended the broader meaning Defendants espouse, the specification would be replete

13  with the "constructive metabolism" language that Defendants' construction invokes.

14      The extrinsic evidence is in accord. First, the inventors testified as to this "whole body"

15  scope. (Gaede Decl., Exs. 19 at 47:7-12 and 22 at 33:1-5, 37:7-13, 93:1-13.) Second, in the '867

16  Patent and its prosecution history, Defendant Celtrix, and Drs. Maack and Sommer: (1) stated that

17  anabolic state means a net increase in body tissue; (2) construed "producing an anabolic state" from

18  the '151 Patent as "an increase in 'total body weight gain as well as the dynamics of statural

19  growth;" and (3) opined that wound healing was patentably distinct from whole-body growth. (1st

20  Roberts Rpt, ¶¶ 91-92, Ex. 20 at pp. 6, 8-9; 2nd Roberts Rpt, ¶¶ 38-41.) Finally, considering the

21  same specification, a United Kingdom court found in denying Insmed's summary judgment motion

22  that "anabolic state" meant promoting a systemic, whole body anabolic effect, rejecting the same

23  arguments that Defendants advance here. (Gaede Decl., Exs. 10 & 11, ¶ 19.)

24      Contrary to their correct prelitigation understanding as to what the '151 Patent defined,

25  Defendants now look to two sentences following the definition as purportedly expanding it to

26  include all constructive metabolisms or anabolisms, no matter how small and how localized:

27          Examples of patients that are relatively resistant to GH but require
            treatment to induce an anabolic effect include those with Turner's
28          Syndrome, GH-deficient children who grow poorly in response to GH
            treatment, children who experience a slowing or retardation in their

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1    normal growth curve about 2-3 years before their growth plate closes,
     so that GH administered alone would no longer increase growth of the
2    children, so-called short normal children, and patients where the IGF-I
     response to GH has been blocked chemically (*i.e.*, by glucocorticoid
3    treatment) or by a natural condition such as in adult patients where the
     IGF-I response to GH is naturally reduced. In addition, the method
4    herein is useful for treating pregnant women who are in a catabolic
     state and/or experience loss of bone mass, for treating women with
5    osteoporosis, and for repairing bone.

6    However, the first sentence merely provides "[e]xamples of patients" that can benefit from the

7    method for "producing an anabolic state," and the second identifies uses of the method where an

8    underlying systemic catabolic condition can be treated. (Appendix B, col. 6:50-68; *see* 1st Roberts

9    Rpt, ¶¶ 84-86; 2nd Roberts Rpt, ¶¶ 31-34.)  Neither sentence espouses to alter the clear defining

10   sentence that "producing an anabolic state" refers to "total body weight gain" or "statural growth."

11        The Defendants point to additional snippets sprinkled throughout the patent that discuss

12   background information to the invention, other potential uses, or other aspects of the invention.

13   (Gaede Decl., Ex. 1, 1st Spencer Rpt, ¶¶ 31-32.)   For example, the Defendants expand the

14   definition of "producing an anabolic state" using the following snippet: "the data show a general

15   anabolic effect in the whole mammal, including whole body weight gain and an increase in organ

16   weight." (Appendix B, col. 4:58-60.)  Tellingly, this and the other snippets do not use Defendants'

17   "constructive metabolism" language, and these snippets do not state or imply that they are

18   expanding or changing the clear lexicographic definition stated.

19        **2.    The "Greater Anabolic State in a Mammal Than That Achieved Using
20              An Equivalent Dose of IGF-I Alone" Element in the Context of the
              Intrinsic Record Requires That the Same Dosing Regimen and Amount
21              of IGF-I Be Compared**

22        This element means to promote total body weight gain or statural growth that is greater

23   than whatever total body weight gain or statural growth would be observed if the same amount of

24   IGF-I as is present in the IGF-I/IGFBP-3 mixture were administered by the same route, regimen,

25   and schedule of administration as used in the administration of the IGF-I/IGFBP-3 mixture.

26   (Appendix D, pp. 4-6.)  In short, the element requires that the doses compared, *i.e.*, complexed

27   IGF-I/IGFBP-3 versus IGF-I alone, must contain the same quantity of IGF-I and they must be

     administered following the same dosing regimen.
28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1    Claim 1 states that the doses must be equivalent and not different:

2           . . . co-administering to the mammal by subcutaneous bolus injection
3    *effective amounts* of IGFBP-3 and IGF-I in a molar ratio of IGFBP-3
     to IGF-I of about 0.5:1 to 3:1 so as to produce a greater anabolic state
     in the mammal than that achieved *using an equivalent dose of IGF-I*
4    alone . . . .

5    (Appendix B, col. 14:4-12 (emphasis added).)

6    The specification confirms that the doses must contain the same quantity of IGF-I:

7           The "*effective amounts*" of IGF-I and IGFBP for purposes herein are
     thus determined by such considerations, with the understanding that
8    the two drugs will be premixed in a molar ratio of IGFBP to IGF-I in
     the range of about 0.5:1 to about 3:1 before administration, *and with*
9    *the understanding that* the amounts administered will promote a
     greater anabolic state in the treated patient over the anabolic effect
10   obtained *using the same amount of IGF-I administered by the same*
     *protocol, regimen, and route, but without IGFBP being also*
11   *administered.*

12   (Appendix B, col. 7:15-25 (emphasis added).) All the examples exemplify administering the same

13   quantity of IGF-I in its complexed or alone state following the same regimen. (Appendix B, col.

14   9:30-12:45; 1st Roberts Rpt, ¶¶ 98-99.) Simply put, the injection of IGF-I/IGFBP-3 must contain

15   the same (equivalent) dose of IGF-I alone administered following the same dosing regimen.

16       The prosecution history is in accord. Applicants argued during prosecution that the claims

17   were patentable over the prior art because the greater anabolic state was achieved only when the

18   IGF-I/IGFBP-3 and IGF-I were both given by subcutaneous bolus injection using the same

19   regimen. (Stipulated Filed History of U.S. Patent No. 5,187,151 ("SFH '151"), Tab 4 at p. 15.)

20   Applicants emphasized this because comparison of IGF-I and IGF-I/IGFBP-3 where both were

21   administered by a different regimen (continuous infusion) did not produce a greater anabolic state

22   for the complex compared to IGF-I alone. (*Id.*)

23       In contrast, Defendants' construction places no limits on the dosing regimen, or amounts

24   in a dose, so long as the same amount of IGF-I is given over some undefined time period. Thus, by

25   Defendants' interpretation, for example, a once a day dose regimen of IGF-I/IGFBP-3 could be

26   compared to a dose of IGF-I alone given every other day, or every third day, so long as the amounts

27   of IGF-I were the same. Conversely, a once a day dose of IGF-I/IGFBP-3 could be compared to

28   two, three, four, or more, doses per day of IGF-I alone so long as the total IGF-I amount

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

PLTFFS' OPENING CLAIM CONSTRUCTION AND
PARTIAL SUMMARY JUDGMENT BRIEF
CASE NO. C-04-5429 CW (EMC)

1   administered remained the same. Defendants cite no express language in the specification that that

2   different doses and dosing regimens (over an undefined time period) may be compared so long as

3   the same overall amount is delivered. (2nd Roberts Rpt, ¶¶ 48-50; 1st Spencer Rpt, ¶¶ 37-38; 2nd

4   Spencer Report ¶¶ 47-48.)

5       Defendants' expert recently articulated that this claim element excludes doses of IGF-I

6   delivered in the IGF-I/IGFBP-3 complex that would be hypoglycemic if the quantity of IGF-I were

7   given as a dose alone. Such exclusionary language is not in the claim, and excludes preferred

8   embodiments, which is "rarely correct." *See SanDisk Corp. v. Memorex Prod., Inc.*, 415 F.3d

9   1278, 1285 (Fed. Cir. 2005) (*citing Vitronics*, 90 F.3d at 1582; *C.R. Bard, Inc. v. U.S. Surgical*

10  *Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004)). First, the specification teaches that a potential

11  advantage to the complex is that larger doses of IGF-I can be delivered in the IGF-I/IGFBP-3

12  complex form due to the reduction in hypoglycemic risk. For example, the Summary of the

13  Invention for the '151 Patent states that "IGFBP blocks hypoglycemia but not the anabolic effect of

14  IGF-I, so that large doses of IGF-I can be given without risk of acute hypoglycemia." (Appendix

15  B, col. 4:50-53.)

16      Second, the prosecution history is contrary to Defendants' interpretation. The Examiner

17  raised an enablement objection to the pending claims in part because the specification allegedly did

18  not teach that doses of IGF-I in its IGF-I/IGFBP-3 form could be safely administered at amounts

19  that would be hypoglycemic if administered as IGF-I alone. (SFH '151, Tab 3 at pp. 4:5 – 5:3.)

20  Applicants argued that such doses were enabled, and the Examiner agreed, finding their arguments

21  "persuasive." (SFH '151, Tab 4 at pp. 5-8; Tab 6 at pp. 1-4; Tab 7 at p. 2:10-15.) Thus, Defendants

22  are attempting to read out a claim scope that the Examiner specifically agreed was enabled. That

23  cannot be a proper construction. By contrast, Plaintiffs' construction includes this preferred

24  embodiment of doses of IGF-I given in complex form that would be hypoglycemic if given alone,

25  consistent with the specification and the prosecution history. (1st Roberts Rpt, ¶¶ 98-99.)

26

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

3.   **Secondary '414 and '287 Patent Claim Construction Issues**

    a.   **Defendants' Attempt to Read in Additional Limitations of "Processing, Folding and Disulfide Bond Formation" Into the '414 Patent Claims is Improper**

Defendants contend that the "human IGF-I" of Claim 1 and the "mature human IGF-I" of Claim 9 must not only be "recovered," but also that the "disulfide bond configuration" of mature human IGF-I must be identical to that of human IGF-I isolated from a normal human, which Defendants' experts interpret to require that all "processing, folding and disulfide bond formation" must be completed.  (Appendix D, p. 15; Gaede Decl., Ex. 7, 1st Burgess Rpt, ¶ 33; Gaede Decl., Ex. 8, 1st Maack Rpt ¶ 58 .)  The claims contain no such language.  Instead, the mature human IGF-I of Claim 9 has a "glycine (gly) residue at its amino terminus" and is free from association with N-terminal amino acid residues.  The human IGF-I of Claim 1 must simply be recovered in any form.  (Appendix D, p. 14.)  Defendants are reading in additional limitations to provide an artificial basis for their Section 112 defenses.  But as explained further in the 2nd Guarente Rpt, ¶¶ 42-44, the intrinsic record is devoid of any statement that the "mature human IGF-I" or the "human IGF-I" must include all "processing, folding and disulfide bond formation."

    b.   **The "Hybridizes, Under Stringent Conditions" Limitation of Claim 1 in the '287 Patent Does Not Require Intent to Exclude Hybridization to DNA Encoding IGFBP-1**

The parties agree that the term "hybridizes, under stringent conditions" from Claim 1 of the '287 Patent means Hybridizing in 50% formamide at 5XSSC at a temperature of 42° C. and washing the filters in 0.2XSSC at 60° C.  (*See* Appendix D, p. 8; Gaede Decl., Ex. 13.)[6]  However, Defendants seek to incorporate an intent sentence from the specification, specifically that: "These conditions are intended to exclude sequences that hybridize to the BP28 sequence," where "BP28" is another name for IGFBP-3.  One of ordinary skill in the art would not understand such an "intent" limitation to be part of the meaning of the term "hybridizes, under stringent conditions" in light of the intrinsic and extrinsic evidence.  (1st Roberts Rpt, ¶¶ 167-168; 2nd Roberts Rpt, ¶¶ 184-191.)

---

[6]  Subsequent to filing the Joint Claim Construction Statement, Plaintiffs notified Defendants that they agreed the term "hybridizes, under stringent conditions," as used in the '287 Patent, comprises the express conditions in the claim and washing the filters in 0.2XSSC at 60°C.

PLTFFS' OPENING CLAIM CONSTRUCTION AND
PARTIAL SUMMARY JUDGMENT BRIEF
CASE NO. C-04-5429 CW (EMC)

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1

**c.  The "BP53 Protein is Human" Limitation of Claim 6 in the '287 Patent is not Limited to Figure 3**

Plaintiffs' construction of the term "BP53 is Human" in Claim 6 properly includes the forms of BP53 that naturally occur in human blood. "BP53" is another name for IGFBP-3. As disclosed in the specification, there are two forms of naturally occurring human IGFBP-3 that contain a one-amino acid difference. (1st Roberts Rpt, ¶ 170; Appendix C, col. 19:7-51.) Defendants' construction disregards this specification teaching through restricting the protein to "having the amino acid sequence of Figure 3" excluding all other forms of IGFBP-3 that occur naturally in human blood, including that exemplified in the specification. (Appendix D, p. 8.) Defendants' narrow reading is inconsistent with the specification's plain teaching that "human BP53" may vary from the Figure 3 sequence. (1st Roberts Rpt, ¶ 169-171; 2nd Roberts Rpt, ¶ 192.)

**4.  Claim Construction Issues Not Relevant To Infringement, Validity, or Enforceability**

This Court need only construe those terms that are in controversy, and "only to the extent necessary to resolve that controversy." *Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). While the following terms are technically in dispute (*i.e.*, the parties did not agree to a stipulated construction), none of these construction disputes affect the infringement, validity, or enforceability of the '287, '414 or '151 Patents that the parties have disclosed under the Patent Local Rules. (Appendix D; 1st Roberts Rpt, ¶¶ 57-79; 2nd Roberts Rpt, ¶¶ 17-26, 52-56; 1st Guarente Rpt, ¶¶ 40-52; 2nd Guarente Rpt, ¶¶ 25-39.) Should the Court wish to address these issues, however, please see Plaintiffs' expert reports on the following claim elements:

- The '287 and '414 Patent elements on "expression vector" and "replicable expression vector" and whether those are limited to plasmids. (1st Roberts Rpt, ¶¶ 176-180; 2nd Roberts Rpt, ¶¶ 195-199; 1st Guarente Rpt, ¶ 40-52; 2nd Guarente Rpt, ¶ 25-39.)

- The "Control Sequences for Expression of the DNA Sequence" element of Claim 7 in the '287 Patent. (1st Roberts Rpt, ¶¶ 173-175; 2nd Roberts Rpt, ¶¶ 193-94.)

- The '151 Patent elements on IGF-1 and IGFBP-3 and whether those elements require the proteins to be properly folded and/or have binding activity. (1st

Roberts Rpt, ¶¶ 67-79; 2nd Roberts Rpt, ¶¶ 21-26, 52-56; Gaede Decl., Ex. 12 at 103:14–105:13 and Gaede Decl., Ex. 21, Ex. 288 to Spencer deposition.)

- The '151 Patent limitation on subcutaneous bolus injection.  (2nd Roberts Rpt, ¶¶ 17-20; 1st Roberts Rpt, ¶¶ 57-66, Exs. 28 and 56.)

## IV.    SUMMARY JUDGMENT

### A.    MOTION FOR SUMMARY JUDGMENT OF THE '414 PATENT THAT DEFENDANTS' PROCESS FOR MAKING IPLEX™ LITERALLY MEETS EVERY ELEMENT OF PROCESS CLAIMS 2 AND 9

Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (en banc).  Where the parties do not dispute any relevant facts regarding the accused product, but "disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *General Mills, Inc. v Hunt-Wesson*, 103 F.3d 978, 983 (Fed. Cir. 1997).  "Disputes concerning the meaning of claims do not preclude summary judgment, because the resolution of those disputes is part of the process of claim interpretation, a question of law." *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998).

*\* REDACTED - CONTAINS CONFIDENTIAL INFORMATION OF DEFENDANTS \**

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1

* REDACTED - CONTAINS CONFIDENTIAL INFORMATION OF DEFENDANTS *

2

3

4

5

6       As set forth in Section III.A.1 above, a methodical construction taking into account the

7  ordinary meaning and all components of the intrinsic record, compels the conclusion that a properly

8  construed Claim 2 encompasses "expression of said human IGF-I" either directly or as a fusion

9  protein.  Following the same approach (Section III.A.2, *supra*), a properly construed Claim 9

10  includes fusion partners "exogenous" to human IGF-I, regardless of whether the sequences are

11  obtained from prokaryotic, eukaryotic, synthetic sources or a combination thereof.

12       Defendant Insmed's FDA documents confirm that its method of making the IGF-I used in

13  IPLEX™ literally meets every element of method Claims 2 and 9 of the '414 Patent.  (*See*

14  Appendix E hereto; *see also*, 1st Guarente Rpt, ¶¶ 94-112; ¶¶ 115-121.)   * REDACTED*

15                 * REDACTED - CONTAINS CONFIDENTIAL INFORMATION OF DEFENDANTS *

16                          * REDACTED*                              (Gaede Decl.,

17  Ex. 15 at pp. 139-141; Ex. 16 at 111:10-112:16.)  Accordingly, Defendants Insmed and ITP are

18  presently practicing the method of Claims 2 and 9 of the '414 Patent and should be summarily

19  adjudicated as literally infringing those claims.

20       **B.      MOTION FOR SUMMARY JUDGMENT OF NO INVALIDITY ON THE '151 PATENT
21               THAT THE MAACK AND SOMMER 1991 ABSTRACTS ARE NOT PRIOR ART UNDER
               SECTION 102(A) SINCE THE INVENTIONS ASSERTED WERE REDUCED TO
22               PRACTICE BEFORE THEIR PUBLICATION**

23       Plaintiffs are entitled to summary judgment of no invalidity on Defendants' anticipation

24  and obvious defenses to the '151 Patent because any reasonable jury would find that they cannot

25  make a clear and convincing showing on an element of their defense. *Eli Lilly & Co. v. Barr Lab.,*

26  *Inc.*, 222 F.3d 973, 980 (Fed. Cir. 2000) (summary judgment of no invalidity is proper when "the

27  nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing

28  evidence on an essential element of a defense upon which a reasonable jury could invalidate the

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1   patent"). Specifically, Defendants cannot establish clearly and convincingly that the January 1991

2   Maack and Sommer abstracts on wound healing using IGF-I/IGFBP-3 are Section 102(a) prior art

3   to asserted Claims 1, 4, 5 and 7 of the '151 Patent because the abstracts are antedated by

4   Genentech's September 1990 reduction to practice of such claims. *See Mahurkar v. C.R. Bard,*

5   *Inc.,* 79 F.3d 1572, 1578 (Fed. Cir. 1996) (prior reduction to practice of claims antedates prior art);

6   (2nd Robert Rpt, Exs. 71 & 72). Reduction to practice occurs when the inventors perform a

7   process that satisfies all of the limitations of the claim, and determine it will work for its intended

8   purpose. *SlipTrack Sys., Inc. v. Metal-Lite, Inc.,* 304 F.3d 1256, 1266 (Fed. Cir. 2002) (cardboard

9   prototype met all the limitations of a count for a building construction assembly/seismic wall

10  structure). The burden of proof to establish by clear and convincing evidence that these two

11  abstracts are Section 102(a) prior art not antedated by Plaintiffs' prior reduction to practice

12  evidence rests with Defendants and is one they cannot meet.[7] *Id.*

### 1. In September 1990 Genentech Reduced To Practice the Inventions Embodied in the Specification's Examples I and III

The undisputed evidence shows that Genentech scientists reduced to practice asserted Claims 1, 4, 5 and 7 by September 1990 – approximately four months prior to the abstracts' January 1991 publication. This work is disclosed in the '151 Patent's specification at Examples I and III relating to experiments in "hypox" rat models. Example I shows that higher doses of IGF-I can safely be administered without hypoglycemia risk in the IGF-I/IGFBP-3 complex form rather than alone. (Appendix B, cols. 9:30-10:54.) Example III shows that IGF-I/IGFBP-3 administered as a complex induces an "anabolic state" that caused an increase in body mass of the laboratory rats. (Appendix B, cols. 11:42-12:46.)

The experiments disclosed in Examples I and III were performed by September 1990:

---

[7] Defendants failed to submit expert testimony on this issue despite the Court's Scheduling Order that Defendants' expert reports on the issue on which they "bear the burden of proof" were to be submitted on January 27, 2006 and Plaintiffs' clear production of antedating evidence in their September 16, November 23, and December 2 interrogatory responses. (Gaede Decl., Exs. 2-4.) Defendants have signaled that they may file a supplemental expert report on this issue. (Gaede Decl., Ex. 1, 1st Spencer Rpt, ¶ 42.) Defendants have already served one late supplemental expert report and have been sanctioned by Magistrate Judge Chen. (Gaede Decl., Ex. 17.) Accordingly, any attempt to introduce expert testimony in opposition would likewise be an improper supplementation and should be stricken as a violation of this Court's Scheduling Order.

McDermott Will & Emery LLP
ATTORNEYS AT LAW
PALO ALTO

1

*REDACTED - CONTAINS CONFIDENTIAL INFORMATION OF PLAINTIFFS*

2

3

4

5

6

7

8

9

10

11

12

13

14     Based on this work, Genentech filed the '151 Patent application on February 12, 1991, and

15     prosecuted claims directed to practicing in humans the methods disclosed in Examples I and III of

16     inducing a greater anabolic state in rats. The Examiner raised an enablement rejection, contending

17     that the data from the specification's rat experiments did not enable the methods claimed to be

18     practiced in humans. (SFH '151, Tab 3 at pp. 4:5 – 5:3.) Genentech responded to this rejection,

19     supported by the Gesundheit Declaration, explaining that Examples I and III were "predictive" of

20     "the effect of administering IGF-I to humans." (SFH '151, Tab 4, pp. 7-8, Tab 6 ¶¶ 4-9.) The

21     Examiner considered these arguments "persuasive" and withdrew the enablement rejection to the

22     claims directed to performing the method in humans. (SFH '151, Tab 7 at 2:10-15.)

23     Defendants, their experts, and Plaintiffs' experts agree that the rat studies here employing

24     the IGF-I/IGFBP-3 complex are predictive of results in humans:

25     • Defendants' Patent Local Rule Preliminary Invalidity Contentions ("PICs") state:
       *"(T)he only experimental data in the '151 specification are for experiments on
26     rats. D.J. 10-2, examples 1-3. Thus, the patent itself demonstrates that the
       extrapolation from rats to humans was reasonably expected by one of ordinary
27     skill at the time. (Id.)"* (1st Roberts Rpt, ¶ 117, Ex. 28 at p.4.)

28     • Defendants' PICs further state that based on the January 1991 Sommer and Maack
       abstracts' rat wound healing studies "one of ordinary skill in the art *would have*

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

*reasonably expected that the method could be applied to humans.*" (1st Roberts Rpt, Ex. 28 at p. 4.)

- Defendants' Expert, Dr. Spencer, opined that he agreed with these contentions. (Gaede Decl., Ex. 1, 1st Spencer Rpt, ¶¶ 44-45; 2nd Roberts Rpt, ¶ 75.)

- Plaintiffs' Expert, Dr. Roberts, also opined that rat animal studies are predictive of results in humans. (2nd Roberts Rpt, ¶ 76.)

For the Court's convenience, attached as Appendix F is a chart from the 2nd Roberts Report citing element by element the evidence supporting and corroborating reduction to practice of Claims 1, 4, 5 and 7, modified to reflect citations to Ms. Mortenson's Declaration.

### 2.   Defendants Cannot Make a Clear and Convincing Showing on the Essential Element That the Maack and Sommer Abstracts Qualify as Section 102(a) Prior Art.

In light of this undisputed evidence, and viewed through the "prism" of Defendants' clear and convincing burden of proof, any reasonable jury would find that Defendants cannot establish the element to their anticipation and obviousness defenses that the January 1991 Maack and Sommer are Section 102(a) art. *See Eli Lilly*, 222 F.3d at 980. As to Claim 1, there is no question that by September 1990, all elements had been reduced to practice in the rat studies reported in the '151 Patent's Example I and III and Figures 7 and 8. In particular, the Example III work performed each and every element of Claim 1 in a mammal and showed that the rats injected with the IGF-I/IGFBP-3 complex obtained a greater anabolic effect than the IGF-I administered alone by the same regimen. This satisfied all Claim 1 elements and showed that the method worked for its intended purpose. (Appendix F; 2nd Roberts Rpt, ¶¶ 68-73.) This work is corroborated by documentary, fact testimonial and expert testimonial evidence. *See Loral v. Matsushita*, 266 F.3d 1358, 1363-64 (Fed. Cir. 2001) (corroboration required on reduction to practice.) With each element literally met and corroborated, Defendants cannot show by clear and convincing evidence that the January 1991 Maack and Sommer abstracts constitute Section 102(a) prior art to Claim 1.

Defendants similarly cannot meet their burden with respect to asserted dependent Claims 4, 5 and 7. Defendants may argue that dependent Claim 4, "wherein the Claim 1 mammal is a human," was not literally reduced to practice by the rat experiments disclosed in the specification. That argument is insufficient to meet their clear and convincing evidence burden of proof.

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

McDermott Will & Emery LLP
Attorneys at Law
Palo Alto

1    ***Claim 4.***   Reduction to practice may be established even though the experiments do not

2    duplicate all the conditions of actual use, particularly where a claim is directed to a use in a human.

3    *See Mahurkar*, 79 F.3d 1578 (catheter for human use reduced to practice by test in the inventors'

4    kitchen because the tests predicted the outcomes for humans); *Scott v. Finney*, 34 F.3d 1058, 1063

5    (Fed. Cir. 1994) (penile implant reduced to practice without testing that showed the invention

6    would work in humans); *Burroughs Wellcome Co. v. Barr Lab. Inc.*, 40 F3d 1233, 1230 (Fed. Cir.

7    1994) (method for treating AIDs patients with AZT reduced to practice by non-human tests that

8    predicted efficacy in humans); *Engelhardt v. Judd*, 369 F.2d 408, 410-411 (C.C.P.A. 1966) (animal

9    tests that predict human outcomes sufficient for reduction to practice).

10   Under these authorities, the September 1990 rat experiments reported as Examples I and

11   III do predict and therefore reduce to practice the human element of Claim 4, as Defendants, their

12   experts, the PTO and Plaintiffs all agree: (1) Defendants' PIC's admissions that the Examples data

13   "demonstrates that the extrapolation from rats to humans was reasonably expected by one of

14   ordinary skill in the art"; (2) their expert's admission on this point; (3) the PTO's agreement that

15   the Examples data enable the "human" element of Claim 4 and; (4) Plaintiffs' own expert opinion.

16   (1st Roberts Rpt, ¶ 117, Exs. 10, 25-28; 1st Spencer Rpt, ¶¶ 44-46; SFH '151, Tab 3 at p. 4, Tab 7

17   at p. 2; 2nd Roberts Rpt, ¶¶ 75-76.)

18   Moreover, Defendants' anticipation and obviousness allegations that the wound healing rat

19   studies disclosed in the subsequent Maack and Sommer abstracts anticipate or render obvious the

20   human element of Claim 4, confirm their inability to meet their burden of proof. *See Merck & Co.,*

21   *Inc. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1372 (Fed. Cir. 2003) (an anticipating reference

22   must describe all the elements and limitations of the claim in a single reference); *Micro Chemical*

23   *Inc. v. Great Plains Chemical Co.*, 103 F.3d 1538, 1546 (Fed. Cir. 1997) (obviousness requires that

24   the prior art provide a motivation to combine the cited prior art and a reasonable expectation of

25   success). Defendants cannot on the one hand *clearly and convincingly show* that the rat wound

26   healing study in the Maack and Sommer abstracts establish the '151 Patent's method of a greater

27   anabolic effect in a "human," yet on the other, *show clearly and convincingly* that Plaintiffs' own

28   earlier rat experiments showing an undisputed anabolic effect do *not* establish the same human

1   element and, thus, were not reduced to practice prior to the art on which Defendants rely.

2       ***Claim 5.***   As to Claim 5, the evidence is uncontradicted that mature human IGF-I and

3   human IGFBP-3 were used in the experiments.  (Gaede Decl., Ex. 19, at p. 97:2-5; 2nd Roberts

4   Rpt, Ex. 60; Mortensen Decl., ¶ 5.)

5       ***Claim 7.***   Finally, the Claim 7 element of "the molar ratio of IGFBP-3 to IGF-I is about .8

6   to 1.5" is met by the reduction to practice of Examples I and III of the '151 Patent performed under

7   Experiment No. 89-136-0320.    (2nd Roberts Rpt, ¶ 76.)                 *REDACTED*

8              *REDACTED - CONTAINS CONFIDENTIAL INFORMATION OF PLAINTIFFS*

9

10        *REDACTED*          (Gaede Decl., Ex. 18; 2nd Roberts Rpt, ¶ 76.)

11      Defendants' PIC anticipation and obviousness charts rely on the Maack or Sommer

12  abstracts to teach at least one element of the four claims asserted.  (1st Roberts Rpt, Exs. 25-28.)

13  Because these abstracts are not prior art, Defendants cannot establish each element of the asserted

14  claims, and thus cannot meet their burden of proof.  *See Merck*, 347 F.3d at 1372, *MicroChemical*,

15  103 F.3d at 1546.

16  **V.     CONCLUSION**

17      For all the foregoing reasons, Plaintiffs respectfully requests that this Court construe the

18  disputed claims in the manner described above and grant Plaintiffs' motions for summary judgment

19  of literal infringement and of no prior art invalidity against Defendants.

20  Dated: _____March 31, 2006_____          MCDERMOTT WILL & EMERY LLP

21

22                                   By:    _____/s/ William G. Gaede, III._____
                                              William G. Gaede, III
23
                                           *Attorneys for Tercica, Inc.*
24

25                                           HELLER EHRMAN LLP

26
                                     By:    _____/s/ M. Patricia Thayer_____
27                                            M. Patricia Thayer

28                                           *Attorneys for Genentech, Inc.*

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO