1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                          OAKLAND DIVISION

5

| | |
|---|---|
| GENENTECH, INC., a Delaware Corporation, TERCICA, INC., a Delaware Corporation | Case No. C-04-5429 (CW) |
| Plaintiffs, | **EXPERT REPORT OF RICHARD R. BURGESS, PH.D. ON CLAIM CONSTRUCTION AND INVALIDITY** |
| v. | |
| INSMED INCORPORATED, a Virginia Corporation, CELTRIX PHARMACEUTICALS, INC., a Delaware Corporation, and INSMED THERAPEUTIC PROTEINS, Inc. a Colorado Corporation. | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS | |

14          In accordance with Rule 26(a)(2) of the Federal Rules of Civil Procedure, Defendants

15   Insmed, Inc., Celtrix Pharmaceuticals, Inc. and Insmed Therapeutic Proteins, Inc. disclose the

16   following report of Richard R. Burgess, Ph.D. who may be offered as an expert witness at trial.

17   **I.      SCOPE OF ASSIGNMENT**

18          1.      I have been retained by the firm of Foley & Lardner, who represent the

19   Defendants in this case, as an expert in the field of recombinant protein expression, purification,

20   and characterization.

21          2.      I have been asked to express an opinion on the meaning of certain terms found in

22   the claims of U.S. Patent Nos. 6,331,414 ("the '414 patent") to one of ordinary skill in the art at

23   the time the applications for these patents were filed.  I have also been asked to express an

24   opinion on the validity of certain claims of this patent.

25          3.      Within the past four years, I have not provided expert testimony by deposition or

26   in trial.  I am being compensated at the rate $250.00 per hour for preparing to testify and

27   testifying in depositions or in court.  My compensation is not dependent on or related in any

28

                                            1

1    manner to the outcome of the current litigation.  I have no financial interest whatsoever in the

2    outcome of the current litigation.

3    **II.    QUALIFICATIONS**

4        4.    In 1964, I received a Bachelor of Science degree in chemistry from the California

5    Institute of Technology, which is commonly called Caltech.  In 1969, I received my Ph.D. in

6    Biochemistry and Molecular Biology from Harvard University.  My graduate school research

7    focused on the purification, characterization, and regulation of RNA polymerase.  I conducted

8    post-doctoral research at the University of Geneva in Switzerland.

9        5.    In 1971, I became an Assistant Professor of Oncology, McArdle Laboratory for

10   Cancer Research at the University of Wisconsin-Madison.  Since that time, I have been promoted

11   several times, and I am now the James D. Watson Professor of Oncology.  As a professor at the

12   University of Wisconsin, my research focuses on RNA polymerase function, activity, and

13   regulation, and on protein expression, and purification.

14       6.    Since 1989, I have been an editor of *Protein Expression and Purification*, a peer

15   reviewed scientific journal.  Since 1999, I have been the editor-in-chief of this journal.

16       7.    I have previously served as an expert witness in one case:  *Hoffman-LaRoche, Inc.*

17   *v. Promega Corp.*, No. C-93-1748 VRW (N.D. Cal.).  In the course of that case, I was deposed

18   and testified in court.

19       8.    A more complete summary of my education and qualifications, including a

20   publication list is set forth in my Curriculum Vitae, which is attached to this report as Exhibit A.

21   **III.    MATERIALS REVIEWED**

22       9.    In my study of this matter, I have reviewed all of the materials as set forth in

23   Exhibit B.

24       10.    My investigation and review in this matter is ongoing.  Additional information

25   may become available which would further support or modify the conclusions that I have

26   reached to date.  In particular, I understand that the Court has not yet construed the claims of the

27   patents at issue.  Accordingly, I reserve the right to consider and comment on any additional

28

2

1    expert statements and testimony of Plaintiffs' experts, as well as based on any decision/order

2    issued by the Court. Any changes or necessary amplification of these conclusions will be

3    addressed in supplemental reports or testimony, which I reserve the right to provide. I also

4    reserve the right to rely on demonstrative exhibits to supplement my testimony at trial.

5    **IV.**     **CRITERIA FOR EVALUATING CLAIM TERMS AND INVALIDITY**

6        **A.**     **Person of Ordinary Skill in the Art**

7        11.     I have been advised that in rendering the opinions set forth in this report that I

8    should consider the patent claims through the eyes of "one of ordinary skill in the art." I have

9    been told to consider factors such as the educational level and years of experience not only of the

10    person or persons who have developed the products that are the subject of the case, but also of

11    others working in the pertinent art; the types of problems encountered in the art; the teachings of

12    the prior art; patents and publications of other persons or companies; and the sophistication of

13    the technology. I further understand that one of ordinary skill in the art is presumed to think

14    along conventional lines without undertaking to innovate. I understand that a person of ordinary

15    skill in the art is not a specific real individual, but rather a hypothetical individual having the

16    qualities reflected by the factors discussed above.

17        **B.**     **Claim Construction**

18        12.     Although I am not a lawyer I have been advised that the starting point of claim

19    interpretation is to determine the meaning the claim language would have to a person of ordinary

20    skill in the art at the time the patent application was filed. I have been advised that the

21    construction of claim terms often requires examination of whether the terms have a particular

22    meaning in the field of art. It is my understanding that such an analysis requires looking to

23    public sources including the words of the claims themselves, the remainder of the specification,

24    the prosecution history, and, if necessary, extrinsic evidence concerning relevant scientific

25    principles, the meaning of technical terms, and the state of the art. I have also been advised that

26    that claims should be construed, when feasible, to sustain their validity. In that regard, I

27    understand that when determining whether to construe a claim to preserve its validity one should

28

WASH_1526172.1

1    look to whether it is reasonable to infer that the PTO would not have issued an invalid patent,

2    and that the ambiguity in the claim language should therefore by resolved in a manner that would

3    preserve the patent's validity.

4        13.    I understand that the parties have agreed as to the meaning of certain claim terms

5    in the patents, and to the extent there is agreement, I have utilized the agreed upon construction.

6    To the extent the parties have disagreed on the construction of certain terms I have so noted and

7    offered my opinions based upon my understanding of those differing claim constructions.

8        **B.    Invalidity**

9        14.    Although I am not a lawyer, I have been advised that the '414 patent is presumed

10   to be valid, but that this presumption can be overcome by clear and convincing evidence.  I

11   understand that clear and convincing evidence is evidence that leads the finder of fact to believe

12   that a particular conclusion is highly probable.

13       15.    I have also been advised that a person is not entitled to a patent under 35 U.S.C.

14   § 112, paragraph 1, if the patent's specification does not provide a written description of the

15   invention in such full, clear, concise and exact terms as to enable any person skilled in the art to

16   which it pertains to make and use the claimed invention.  I understand that the purpose of the

17   written description requirement is to prevent an applicant from later asserting that he invented

18   something that he did not.

19       16.    I have further been advised that, pursuant to 35 U.S.C § 112, paragraph 1, to be

20   valid, a patent must provide sufficient information that a person of ordinary skill in the art could

21   make and use the claimed invention.  I understand that some amount of experimentation to make

22   and use the invention is allowable. In determining whether the '414 patent's specification would

23   enable a person of ordinary skill in the art to make and use the claimed invention, I considered

24   the following factors:

25       •    the time and cost of any necessary experimentation;

26       •    how routine any necessary experimentation is in the field of
27            recombinant protein expression, purification and
             characterization;

28

4

WASH_1526172.1

- whether the patent discloses specific working examples of the claimed invention;

- the amount of guidance presented in the patent;

- the nature and predictability of the field;

- the level of ordinary skill in the field of recombinant protein expression, purification and characterization; and

- the scope of the claimed invention.

I understand that enablement is tested as of the date the original patent application was first filed.

17.    I have been advised that pursuant to 35 U.S.C. § 101, to be valid, a patent must disclose substantial or practical utility.

## V.    LEVEL OF ORDINARY SKILL IN THE ART

18.    I have assessed the level of skill in the art based upon my experience practicing in the field of recombinant protein expression, purification, and characterization as of the '414 patent's June 6, 1983, effective filing date.

19.    On June 6, 1983, a person of ordinary skill in the art of recombinant protein expression, purification and characterization would have been a graduate student in an academic laboratory or a technician in an industrial lab.  Such a person would have had a bachelor's degree in biology or biochemistry and two to three years of laboratory experience after the undergraduate degree.  A person of ordinary skill in the art most likely would not have had a Ph.D.  Rather, he or she would have been supervised by a Ph.D. level scientist.

## VI.    BACKGROUND OF THE TECHNOLOGY

20.    I intend to generally discuss and illustrate in my testimony basic technical concepts necessary for the Court and the jury to understand the opinions I have reached in this case.

21.    In my view, it is particularly important to note that, while the recombinant expression, purification, and characterization of proteins is now almost routine, in 1983, it was very much considered cutting edge science.  Indeed, on July 10, 1993, I submitted a paper describing work performed in my laboratory that resulted in the overexpression and purification

5

of the sigma70 subunit of *E. coli* RNA polymerase to *Gene*, which is one of the most prestigious journals in the field. This paper was published in *Gene* because the editors and peer reviewers determined that it represented a substantial contribution to the field.

## VII.   THE '414 PATENT

### A.   Claim Construction

22.   I understand the parties have submitted the following proposed constructions to the Court with respect to certain terms in the claims of the '414 patent that are at issue and for which I have been asked to offer my opinion:

**Claim 1**:   A process for producing human IGF-I comprising preparing a replicable expression vector capable of expressing the DNA sequence encoding human IGF-I in a prokaryotic host cell, transforming a prokaryotic host cell culture with said vector to obtain a recombinant host cell, culturing said recombinant host cell culture under conditions permitting expression of said human IGF-I encoding DNA sequence to produce human IGF-I, and recovering said human IGF-I.

| CLAIM TERM | PLAINTIFFS' CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Human IGF-I | "Human IGF-I" means a polypeptide that corresponds in amino acid sequence to mature human insulin-like growth factor-I (IGF-I) naturally occurring in human blood, and optionally can include an additional methionine amino acid at the N terminal end. | "Human IGF-I" means "Mature Human IGF-I" (which lacks its signal or leader peptide); excludes IGF-I fusion proteins. |

| CLAIM TERM | PLAINTIFFS' CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Replicable expression vector | "Replicable expression vector" means any DNA sequence capable of effecting expression of a specified DNA code disposed therein and capable of being replicated inside a host cell. | "Replicable expression vector" means a non-chromosomal DNA sequence, wherein all elements for replication and transcription reside on the same DNA molecule, that can be reproduced multiple times in a host cell, and that is capable of effecting expression of a specified DNA code disposed therein. |

| CLAIM TERM | PLAINTIFFS' CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| A replicable expression vector capable of expressing the DNA sequence encoding | "A replicable expression vector capable of expressing the DNA sequence encoding human IGF-I in a prokaryotic host cell" means | "A replicable expression vector capable of expressing the DNA sequence encoding human IGF-I in a prokaryotic host cell" means |

6

| human IGF-I in a prokaryotic host cell | that the replicable expression vector is capable of expressing human IGF-I either as a fusion protein or directly. | a "replicable expression vector" containing a DNA sequence to be expressed in a "prokaryotic host cell" that encodes only "human IGF-I," not DNA sequences that encode IGF-I fusion proteins. |

| CLAIM TERM | PLAINTIFFS' CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
| --- | --- | --- |
| Expression of said human IGF-I encoding DNA sequence to produce human IGF-I | "Expression of said human IGF-I encoding DNA sequence to produce human IGF-I" means that the DNA sequence encoding for human IGF-I is expressed directly or as a fusion protein. | "Expression of said human IGF-I encoding DNA sequence to produce human IGF-I" means expression of a DNA sequence in a host cell, which results in the direct production of "Human IGF-I." |

| CLAIM TERM | PLAINTIFFS' CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
| --- | --- | --- |
| Recovering said human IGF-I | "Recovering said human IGF-I" means that the "human IGF-I" is recovered directly or as a fusion protein | "Recovering said human IGF-I" means isolating "human IGF-I" from the cell culture without additional modifications of its amino acid sequence. |

**Claim 9**:    A process for producing mature human IGF-I comprising culturing a recombinant prokaryotic host cell, transformed with a replicable expression vector capable of expressing in a suitable host cell a DNA sequence encoding a fusion protein comprised of human IGF-I fused at the N-terminus of the IGF-I to amino acid sequence exogenous to human IGF-I, under conditions permitting expression of the DNA sequence, and cleaving the fusion protein to release mature human IGF-I having the proper amino terminus (gly).

| CLAIM TERM | PLAINTIFFS' CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
| --- | --- | --- |
| Mature human IGF-I | "Mature human IGF-I" means a polypeptide that corresponds in amino acid sequence to human insulin-like growth factor-I (IGF-I) naturally occurring in a human. Mature human IGF-I has a glycine (gly) residue at its amino terminus and is free from association with N-terminus amino acid residues. | "Mature human IGF-I" means a polypeptide having the same amino acid sequence and disulfide bond configuration as "Human IGF-I" isolated from a normal human. |

7

| CLAIM TERM | PLAINTIFFS' CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| A fusion protein | The term "fusion protein" should be construed in the context of the claim language " comprised of human IGF-I fused at the N-terminus to amino acid exogenous to human IGF-I," and thus an independent construction outside the meaning of the claim is not appropriate. | "A fusion protein" means a final translation product that is a single polypeptide chain composed of amino acid sequences from two or more distinct proteins. |

| CLAIM TERM | PLAINTIFFS' CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| Fusion protein comprised of human IGF-I fused at the N-terminus to amino acid sequence exogenous to human IGF-I | "Fusion protein comprised of human IGF-I fused at the N-terminus to amino acid sequence exogenous to human IGF-I" means a non-natural protein encompassing an amino acid sequence that corresponds to the mature human IGF-I sequence linked at its amino terminus to an amino acid sequence from any source other than the human IGF-I sequence. | "Fusion protein comprised of human IGF-I fused at the N-terminus to amino acid sequence exogenous to human IGF-I" means a "fusion protein" composed of a domain with an amino acid sequence taken from a prokaryotic cell attached to the N-terminus of a domain with the amino acid sequence of "Human IGF-I." |

23.    I may testify about the proper interpretation of some of these disputed claim terms:

### 1.    Claim 1

#### a.    "Human IGF-I"

24.    I believe that Defendants' proposed interpretation of this phrase is correct. Plaintiffs, on the other hand, have suggested two different definitions of the term "human IGF-I."

25.    Plaintiffs first suggest that the term means "a polypeptide that corresponds in amino acid sequence to mature human insulin-like growth factor-I (IGF-I) naturally occurring in human blood, and optionally can include an additional methionine amino acid at the N terminal end." Later, however, Plaintiffs expand their definition of "human IGF-I" to encompass fusion proteins. For example, Plaintiffs' proposed construction of the phrase "recovering said human IGF-I" expands "human IGF-I" to include fusion proteins.

26.    Fusion proteins are a single polypeptide chain composed of sequences from two

8

1    or more distinct proteins.  In other words, when IGF-I is expressed as a fusion protein, many

2    amino acids are added to the N-terminus of the human IGF-I polypeptide.  Plaintiffs' first

3    definition of "human IGF-I" only allows for addition of a single amino acid, methionine.

4    Because Plaintiffs' first definition quite clearly does not include fusion proteins, Plaintiffs'

5    second definition, which does include fusion proteins, is inconsistent with the first.

6        27.    It is my opinion that Defendants' definition of the term "human IGF-I," which is

7    substantively the same as Plaintiffs' first definition, is correct.  I reach this conclusion for the

8    following reasons:  *First*, Claim 9 of the '414 patent is expressly targeted to fusion proteins.

9    Therefore, Claim 1 should be read as limited to direct expression of IGF-I, not expression of

10   IGF-I as a fusion protein.  *Second*, a person of ordinary skill in the art in 1983 would have

11   understood a claim directed to a "method of producing" a particular protein to result in the

12   production of that protein and not to result in production of a fusion protein incorporating a

13   particular amino acid sequence.

14                          **b.    "Replicable expression vector"**

15       28.    I believe that Defendants' proposed interpretation of this term is correct.  It is my

16   understanding that the primary difference between the parties' proposed interpretations is

17   whether the term "replicable expression vector" is limited to non-chromosomal DNA.  I believe

18   that the term is so limited because, in 1983, a person of ordinary skill in the art would have

19   understood the term "vector" to be limited to plasmids and viruses.  These were the most

20   commonly used vectors for genetic engineering because they were well characterized and their

21   size permitted easy genetic and mechanical manipulation.  Indeed, I am not aware of any

22   chromosome-sized protein expression vectors that were in use at that time.  If there were any,

23   they were either newly developed, not widely used, or not well known to persons of ordinary

24   skill.  Indeed, I note that plasmids are the only type of expression vector expressly described in

25   the '414 patent.

26       29.    Plaintiffs' definition is incorrect because it encompasses any DNA of any size that

27   is capable of effecting expression.  If Plaintiffs' definition is correct, Claims 1-4 and 9-10 of the

28

9

WASH_1526172.1

1    '414 patent are invalid because the patent neither describes such a broad range of "replicable

2    expression vectors" nor enables a person of ordinary skill in the art to use them.

3                    c.      "A replicable expression vector capable of expressing the DNA
                             sequence encoding human IGF-I in a prokaryotic host cell"
4

5        30.    Plaintiffs' proposed interpretation of this phrase defines the term "human IGF-I"

6    in a manner inconsistent with their first interpretation.  For the reasons discussed above, I believe

7    that Plaintiffs' proposed interpretation is incorrect, and that Defendants' proposed construction is

8    correct.

9                    d.      "Expression of said human IGF-I encoding DNA sequence to
                             produce human IGF-I"
10

11       31.    Plaintiffs' proposed interpretation of this phrase defines the term "human IGF-I"

12   in a manner inconsistent with their first interpretation.  For the reasons discussed above, I believe

13   that Plaintiffs' proposed interpretation is incorrect, and that Defendants' proposed construction is

14   correct.

15                   e.      "Recovering said human IGF-I"

16       32.    Plaintiffs' proposed interpretation of this phrase defines the term "human IGF-I"

17   in a manner inconsistent with their first interpretation.  For the reasons discussed above, I believe

18   that Plaintiffs' proposed interpretation is incorrect, and that Defendants' proposed construction is

19   correct.

20           2.      Claim 9

21                   a.      "Mature human IGF-I"

22       33.    I believe that Defendants' proposed construction of this term is correct.  In my

23   view, the word "mature" signifies that the IGF-I is in its functional state.  This state includes that

24   all processing, folding and disulfide bond formation has been completed to create the "mature"

25   protein.

26                   b.      "A fusion protein"

27       34.    In 1983, it was my understanding that one of ordinary skill in the art would

28

                                                    10

understand a fusion protein to be defined as proposed by Defendants because a fusion protein was a single polypeptide chain composed of amino acid sequences from two or more distinct proteins, and that a fusion partner would not be composed solely of amino acids encoded by a small linker oligonucleotide. This is particularly true because oligonucleotide synthesis was not widely available. Therefore, a person of ordinary skill in the art would not have been able to routinely make or use such linkers. Work that did make use of such linkers would have been considered uncommon.

35.    Many of the smaller fusion partners that are now used in to facilitate purification of the fusion protein either were not known or were not in common use in 1983. For example, "histidine tags," which are a fusion partner used to facilitate purification by introducing a metal binding region into the fusion protein, were not developed until much later.

c.    **"Fusion protein comprised of human IGF-I fused at the N-terminus to amino acid sequence exogenous to human IGF-I"**

36.    Based on my understanding of the meaning of "fusion protein" as set forth in ¶¶ 34-35, and for purposes of consistency, it is my opinion that Defendants' proposed construction of this phrase need not include the words "of a domain with."

37.    I believe that Defendants' proposed interpretation of this term is correct because a person of ordinary skill in the art, having read the '414 patent's specification, would have understood the phrase "fusion protein comprised of human IGF-I fused at the N-terminus to amino acid sequence exogenous to human IGF-I" to be limited to fusion proteins comprised of a prokaryotic protein fused to the N-terminus of IGF-I.

38.    As I discussed above, in 1983, the technology for expression of recombinant proteins was still poorly developed and not well understood or predictable. Indeed, at the time it was commonly believed that it was preferable to directly express a protein rather than to express it as a fusion protein. Where fusion proteins were created, they were generally an artifact of the particular promoter and vector chosen for the expression. Thus, the vast majority of fusion proteins produced in prokaryotes in 1983 would have comprised a prokaryotic protein fused to the N-terminal of the expressed protein as a consequence of the cloning process. I am not aware

11

1    of any reason why a person of ordinary skill in the art at that time would have wanted to create a

2    heterologous/heterologous fusion protein.

3        39.    Furthermore, a review of the '414 patent's specification would have confirmed

4    this expectation.  The specification states:

> In practice, the use of recombinant DNA technology can express
> entirely heterologous polypeptides—so-called direct expression—
> or alternatively may express a heterologous polypeptide fused to a
> portion of the amino acid sequence of a homologous polypeptide.
> In the latter cases, the intended bioactive product is sometimes
> rendered bioinactive within the fused, homologous/heterologous
> polypeptide until it is cleaved in the extracellular environment.

9    '414 patent, col. 2, line 65-col. 3, line 6.

10        40.    Similarly, the '414 patent only gives two examples of the expression of IGF-I in a

11   prokaryotic host.  In both of these examples, the IGF-I is expressed as fusion protein with a

12   portion of a bacterial trp protein attached to the N-terminus of the IGF-I.  Thus, the examples in

13   the '414 patent would not cause a person of ordinary skill in the art to understand that the '414

14   patent either disclosed or claimed anything other than expression of a fusion protein comprising

15   a prokaryotic protein attached to the N-terminus of the IGF-I.

**B.    The Claims at Issue are Invalid for Failure to Comply with 35 U.S.C. § 112, First Paragraph**

**1.    Insufficient Written Description**

**a.    Claims 9 and 10**

20        41.    If the Court interprets the phrase "fusion protein comprised of human IGF-I fused

21   at the N-terminus to amino acid sequence exogenous to human IGF-I" to include fusion proteins

22   composed of a portion of a heterologous protein attached to the N-terminus of IGF-I, it is my

23   opinion that claims 9 and 10 of the '414 patent are invalid.

24        42.    A person of ordinary skill in the art would not understand from reading the '414

25   patent's specification that the invention encompassed such fusion proteins.  As discussed in ¶ 39

26   above, the '414 patent explains that, in 1983, the state of the recombinant protein expression art

27   was such that the term "fusion protein" was limited to homologous-heterologous fusions.  My

28

WASH_1526172.1

1   personal knowledge confirms the accuracy of this characterization.  Therefore, a person of

2   ordinary skill in the art would not have understood the '414 patent's specification to describe an

3   invention of such broad scope.  The specification simply provides no indications that the

4   inventors thought they had created such a broad invention.

5                                    **b.     Claims 1-4**

6          43.     As discussed in ¶¶ 24-26 above, Plaintiffs have offered two inconsistent

7   definitions of the term "human IGF-I."  If the Court adopts Plaintiffs' second, broader definition

8   of "human IGF-I" and their broad definition of fusion protein, it is my opinion that claims 1-4 of

9   the '414 patent are invalid for lack of written description.  Plaintiffs' second definition of

10  "human IGF-I" includes production and recovery of human IGF-I as a fusion protein.  This

11  definition, therefore, implicitly incorporates Plaintiffs' proposed definition of the term fusion

12  protein from claim 9.  Thus, if the Court adopts Plaintiffs' second, broader definition of the term

13  "human IGF-I," and their broad definition of fusion protein, claims 1-4 lack adequate written

14  description support for the reasons set forth with respect to claims 9 and 10 in ¶¶ 41-42 above.

15                                **2.     Lack of Enablement**

16         44.     It is my opinion that at least claims 1-4, 9 and 10 of the '414 patent are invalid

17  because the '414 patent's specification does not enable a person of ordinary skill to make and use

18  the claimed invention.  I note that these claims each encompass either "human IGF-I" or "mature

19  human IGF-I."  While I understand that the parties disagree over the precise wording of

20  definitions for these terms, it is my understanding that neither party defines the term in a manner

21  that encompasses a fusion protein.  Rather, the claimed invention is mature IGF-I.

22         45.     The teaching in the '414 patent's specification is incomplete in many details.

23  Indeed, the specification never demonstrates or even claims that a prokaryotic host cell can be

24  used to produce mature human IGF-I.  Rather, the only examples of prokaryotic expression of

25  IGF-I provided in the specification create trp/IGF-I fusion proteins.  The '414 patent's

26  specification, therefore, contains no teaching of at least the following steps that would be needed

27  to produce mature human IGF-I:

28               •      Cleavage of the fusion protein;

                                           13

1         •     Refolding of the cleaved IGF-I

2         •     Purification of the IGF-I from the results of the cleavage process, and

3         •     Demonstration of the bioactivity of the resulting IGF-I.

4         46.     Each of these steps contains multiple, critical variables that a person of ordinary

5 skill would have to consider to determine conditions that might work to produce mature human

6 IGF-I. For example, the '414 patent's specification describes resolubilizing inclusion bodies

7 containing trp/IGF-I fusion proteins in 6M guanidine-HCl. The resolubilized fusion protein is

8 then diluted 50-fold with dilute buffers. Although the '414 patent does not so state, after

9 dilution, one of ordinary skill in the art might attempt to cleave the fusion protein using

10 *Clostridium histolyticum* collagenase. Because the '414 patent does not provide any guidance—

11 or, indeed, even state that such an experiment was even attempted—the person of ordinary skill

12 would not know whether the collagenase treatment would work. To attempt the cleavage, the

13 person of ordinary skill would have to determine at least the following:

14         •     Buffer conditions that would (1) keep an adequate amount of fusion
               protein in solution, (2) support collagenase activity, and (3) keep an
15                adequate amount of mature human IGF-I in solution

16         •     The concentration of the fusion protein after dilution

17         •     The amount of collagenase to use

18         •     The proper time interval between dilution and addition of the collagenase

19         •     The proper temperature for the collagenase treatment

20         •     How long to allow the collagenase digestion to proceed

21         •     Whether and how to inactivate the collagenase

22 I recognize that the '414 patent's specification cites Wunsch, E. et al., *Hoppe-Seyler's Z. Physiol.*

23 *Chem. Bd.* 362, S1285-1287 (September 1981) as describing the enzymatic proteolysis that could

24 be applied to his system. '414 patent, col. 13, lines 40-41. Wunsch, however, did not discuss

25 application of any protease to a trp/IGF-I fusion protein. Thus, Wunsch provides only limited

26 guidance in addressing these variables.

27         47.     Because the '414 patent does not contain any specific guidance for the isolation of

28

Burgess Report on Claim
Construction and Invalidity

WASH_1526172.1

mature human IGF-I from inclusion bodies containing trp/IGF-I fusion proteins, a person of ordinary skill would have to resolve similar questions for each of the steps I identified in ¶ 45 above. This process would be expensive, time consuming, and difficult. Furthermore, because the '414 patent does not provide or even state that the inventors successfully completed these steps, the person of ordinary skill in the art would have no reassurance that the steps could be completed successfully.

48.     Therefore, it is my opinion that at least claims 1-4, 9 and 10 of the '414 patent are invalid because the '414 patent's specification does not enable a person of ordinary skill to make and use the claimed invention.

**C.      The Claims at Issue are Invalid for Failure to Comply with the Requirements of 35 U.S.C. § 101**

49.     It is my opinion that the prokaryotic expression method disclosed in the '414 patent has not been demonstrated to have any substantial utility. In particular, I note the only material produced by expression of a recombinant protein in a prokaryotic host cell is a trp/IGF-I fusion protein. While the '414 patent's specification states that the protein is "biologically active," the only evidence of the alleged bioactivity is activity in a radioimmune assay ("RIA"). '414 patent, col. 16, lines 13-19. In my opinion, this does not constitute proof of bioactivity or any other substantial or practical utility. The RIA does not prove utility for at least the following reasons:

- An RIA does not demonstrate that the IGF-I portion of the fusion protein is properly folded

- The '414 patent's specification does not state that the RIA was performed in a manner that could determine the purity of the protein produced by the process described in the patent

- A positive RIA assay does not does not tell a person of ordinary skill in the art anything about the bioactivity of the protein.

50.     In particular, I note that the antibodies used in the Hintz reference cited in the '414 patent's specification were produced using a short polypeptide. Therefore, RIA performed using Furlanetto's method, as modified by Hintz, only demonstrates that, at most, the fusion

15

1   protein has the amino acid sequence used to produce the antibodies.

2          51.     As I discussed above, the '414 patent does not provide any guidance on the

3   cleavage and purification of mature human IGF-I from the fusion protein. The bioassay results

4   reported for the fusion protein cannot, therefore, demonstrate utility for the claimed invention.

5          52.     Given the state of the art in 1983, proper characterization was a critical step in

6   proving that a reported process had successfully produced a recombinant protein. For example,

7   in M. Gribskov & R.R. Burgess, "Overexpression and purification of the sigma subunit of

8   *Escherichia coli* RNA polymerase," *Gene*, 26:109-118 (1983), Dr. Gribskov and I demonstrated

9   that we had produced useful protein by showing the purity of the final product and that it had

10  comparable or superior activities and properties to protein isolated from *E. coli* that did not

11  overexpress the protein. We undertook, and *Gene* published, this extensive characterization

12  because, at that time, it was not obvious that a protein that had been refolded would have the

13  correct conformation and proper biological activity.

14         53.     In contrast, the '414 patent does not show and does not even claim that the

15  inventors have obtained any data regarding the purity or activity of any mature human IGF-I that

16  may have been produced by expression in a prokaryotic host cell. It is therefore my opinion that

17  the specification of the '414 patent does not establish the utility of the claimed methods for

18  making human IGF-I.

19         I declare under penalty of perjury that the foregoing is true and correct to the best of my

20  knowledge.

21  Date:   January 27, 2006

        Richard R. Burgess, Ph.D.

22

23

24

25

26

27

28

Burgess Report on Claim