**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8        IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   GENENTECH, INC., a Delaware                No. C 04-5429 CW
     corporation, and TERCICA, INC., a
12   Delaware corporation,

13           Plaintiffs,                            FINAL JURY
                                                   INSTRUCTIONS
14       v.

15   INSMED INCORPORATED, a Virginia
     corporation; CELTRIX PHARMACEUTICALS,
16   INC., a Delaware corporation; and
     INSMED THERAPEUTIC PROTEINS, INC. a
17   Colorado Corporation,

18           Defendants.
     _____/
19
     AND RELATED COUNTERCLAIMS.
20    _____/

21

22            **DUTIES OF JURY TO FIND FACTS AND FOLLOW LAW**

23        Members of the jury, now that you have heard all the evidence,

24   it is my duty to instruct you on the law which applies to this

25   case.  A copy of these instructions will be available in the jury

26   room for you to consult if you find it necessary.

27        It is your duty to find the facts from all the evidence in the

28   case.  To those facts you will apply the law as I give it to you.

You must follow the law as I give it to you whether you agree with it or not. You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important. You must not read into these instructions or into anything the court may have said or done any suggestion as to what verdict you should return -- that is a matter entirely up to you.

**WHAT IS EVIDENCE**

The evidence from which you are to decide what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits which have been received into evidence; and

(3) any facts to which the lawyers have agreed or stipulated.

**WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from

2

the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition, some testimony and exhibits have been received only for a limited purpose; where I have given a limiting instruction, you must follow it.

(4) Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what the witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

## CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

3

**United States District Court**
For the Northern District of California

1    In considering the testimony of any witness, you may take into

2 account:

3    (1)  the opportunity and ability of the witness to see or hear

4 or know the things testified to;

5    (2)  the witness' memory;

6    (3)  the witness' manner while testifying;

7    (4)  the witness' interest in the outcome of the case and any

8 bias or prejudice;

9    (5)  whether other evidence contradicted the witness'

10 testimony;

11    (6)  whether the witness made prior inconsistent statements;

12    (7)  the reasonableness of the witness' testimony in light of

13 all the evidence; and

14    (8)  any other factors that bear on believability.

15    The weight of the evidence as to a fact does not necessarily

16 depend on the number of witnesses who testify.

17                    **OPINION EVIDENCE, EXPERT WITNESSES**

18    You have heard testimony from persons who, because of

19 education or experience, are permitted to state opinions and the

20 reasons for those opinions.

21    Opinion testimony should be judged just like any other

22 testimony.  You may accept it or reject it, and give it as much

23 weight as you think it deserves, considering the witness' education

24 and experience, the reasons given for the opinion, and all the

25 other evidence in the case.

26            **DEMONSTRATIVE EXHIBITS NOT RECEIVED IN EVIDENCE**

27    Certain demonstrative exhibits that have not been received in

28                                4

evidence have been shown to you in order to help explain the
evidence in the case.  They are not themselves evidence or proof of
any facts.  If they do not correctly reflect the evidence in the
case, you should disregard these demonstrative exhibits and
determine the facts from the underlying evidence.

**SUMMARY OF CONTENTIONS**

I will first give you a summary of each side's contentions
in this case.  I will then tell you what each side must prove to
win on each of its contentions.

As I previously told you, Plaintiffs Genentech and Tercica
seek money damages from Defendant Insmed for allegedly directly
infringing the '287 and '414 patents by making, using, selling, and
offering for sale a product or methods that Plaintiffs argue are
covered by claims 1, 6-8, and 17 of the '287 patent and claims 1-4
and 9-10 of the '414 patent, and indirectly infringing claims 1 and
4-5 of the '151 patent by inducing or contributing to the
infringement of another.  These are the asserted claims of the
'151, '287, and '414 patents.  The product that is alleged to
infringe is a medication called iPlex, and the methods that are
alleged to infringe are the methods of using and making iPlex.

It has already been determined in another proceeding that
Insmed has literally infringed claims 1-4 and 9-10 of the '414
patent.  You need not be concerned with that determination.

Insmed denies that it has infringed the asserted claims of the
'151 and '287 patents.  Insmed contends that the asserted claims of
the '414 patent are invalid for lack of enablement and for lack of
written description.

**United States District Court**

For the Northern District of California

1   Your job is to decide (1) whether the asserted claims of the

2   '151 and '287 patents have been infringed and (2) whether any of

3   the asserted claims of the '414 patent are invalid.

4   If any claim of the patents has been infringed and is not

5   invalid, you will then need to decide the money damages to be

6   awarded to Plaintiffs to compensate them for the infringement.  You

7   will also need to decide whether the infringement was willful.

8   If you decide that any infringement was willful, you may not

9   consider that decision in deciding on any damages award.  I will

10  take willfulness into account later.

11                     **INTERPRETATION OF CLAIMS**

12  I have interpreted the meaning of some of the language in the

13  patent claims involved in this case.  You must accept those

14  interpretations as correct.  My interpretation of the language

15  should not be taken as an indication that I have a view regarding

16  the issues of infringement and invalidity.  The decisions regarding

17  infringement and invalidity are yours to make.

18  For the `151 patent:

19  The phrase "produce a greater anabolic state" means "promote

20  a greater total body weight gain as well as statural growth."

21  The phrase "greater anabolic state in the mammal than that

22  achieved using an equivalent dose of IGF-I" means "promote total

23  body weight gain or statural growth that is greater than whatever

24  total body weight gain or statural growth, if any, would be

25  observed if the same amount of IGF-I as is present in the

26  IGF-I/IGFBP-3 mixture were administered by the same route, regimen,

27  and schedule of administration as used in the administration of the

28                                  6

**United States District Court**
For the Northern District of California

1    IGF-I/IGFBP-3 mixture."

2        The term "co-administering" means "administering a mixture

3    of IGF-I and IGFBP-3."

4        The term "IGF-I" means "a polypeptide that corresponds in

5    amino acid sequence to insulin-like growth factor-I from any

6    species, including bovine, ovine, porcine, equine, and preferably

7    human, in native-sequence or in variant form and from any source,

8    whether natural, synthetic, or recombinant, provided that it will

9    bind to an IGFBP at the appropriate site."

10       The phrase "molar ratio of IGFBP-3 to IGF-I" means "the ratio

11   of the number of molecules of IGFBP-3 to the number of molecules of

12   IGF-I."

13       The phrase "about 0.5:1 to about 3:1" means "a ratio of about

14   5 molecules of IGFBP-3 to 10 molecules of IGF-I to about 30

15   molecules of IGFBP-3 to 10 molecules of IGF-I."

16       The phrase "about 0.8:1 to 1.5:1" means "a ratio of about 8

17   molecules of human IGFBP-3 to 10 molecules of human native-

18   sequence, mature IGF-I to about 15 molecules of human IGFBP-3 to

19   10 molecules of human native-sequence, mature IGF-I."

20       The phrase "effective amounts" means "the amounts of IGF-I

21   and IGFBP-3 co-administered produce a 'greater anabolic state in

22   the mammal than that achieved using an equivalent dose of IGF-I

23   alone.'"

24       For the `287 patent:

25       The phrase "hybridizes, under stringent conditions" means

26   "single strands of DNA from two sources form a stable double-

27   stranded structure that remains intact during manipulation in the

28

following conditions: Hybridizing in 50% formamide at 5XSSC at a
temperature of 42º C. and washing the filters in 0.2XSSC at 60º C."

The phrase "the portion of the DNA sequence of FIG. 3
coding for mature BP53 or the preprotein for BP53" means "the
portion of the nucleotide sequence depicted in Figure 3 that
encodes the amino acid sequence as indicated by the positive
amino acid residues in Figure 3 (mature BP53) or the amino acid
sequence as indicated by all of the numbered amino acid residues
in Figure 3 (preprotein for BP53)."

The term "BP53" means "a mammalian insulin-like growth
factor binding protein having the amino acid sequence of Figure 3,
together with analogues and variants thereof that are capable
of specifically binding IGF-I or IGF-II."

The phrase "operably linked" refers to "juxtaposition such
that the normal function of the components can be performed."

The phrase "insulin-like Growth Factor Binding Protein" has
the same meaning as "BP53."

For the `414 patent:

The term "expression" used in claim 1 covers both fusion and
direct expression.

The term "human IGF-I" comprises the amino acid sequence
corresponding to human IGF native to human tissue; human IGF-I
does not include fusion proteins.

The phrase "exogenous to human IGF-I" means "any other source
other than the human IGF-I sequence."

The term "human IGF-I" in claim 1, and the phrase "mature
human IGF-I" in claim 9 refer to bioactive material.

United States District Court

For the Northern District of California

1    The phrase "capable of expressing" means "capable of producing

2  the encoded polypeptide sequence."

3    The phrase "prokaryotic host cell culture" means "a culture

4  of cells or organisms in which the genetic material is not enclosed

5  in a nucleus, which can be transformed with a 'replicable

6  expression vector'."

7    The phrase "culturing said recombinant host cell culture"

8  means "growing cells that contain DNA from another source in a

9  specially prepared medium."

10   The phrase "refractile bodies" means "protein aggregates,

11 also called inclusion bodies, that can be present in both the

12 cytoplasmic and periplasmic space of bacteria upon expression of

13 a DNA sequence encoding a protein."

14   The phrase "cleaving the fusion protein to release mature

15 human IGF-I having the proper amino terminus (gly)" means "the

16 fusion protein is separated in a manner that yields mature human

17 IGF-I protein with glycine at the amino terminus."

18   You should give the remaining terms of the asserted claims of

19 the `151, `287 and `414 patents their ordinary, everyday meaning.

20                   **INFRINGEMENT -- BURDEN OF PROOF**

21   I will now instruct you on the rules you must follow in

22 deciding whether Plaintiffs have proven that Insmed has infringed

23 one or more of the asserted claims of the `151 and `287 patents.

24 To prove infringement of any claim by Insmed, Plaintiffs must

25 persuade you that it is more likely than not that Insmed has

26 infringed that claim.

27

28                                      9

**United States District Court**
For the Northern District of California

1

**DIRECT INFRINGEMENT**

2      A patent's claims define what is covered by the patent.  A

3  product or method directly infringes a patent if it is covered by

4  at least one claim of the patent.  This type of infringement is

5  called "direct infringement."

6      Deciding whether a claim has been directly infringed is a

7  two-step process.  The first step is to decide the meaning of the

8  patent claim.  I have already made this decision, and I have

9  already instructed you as to the meaning of the asserted patent

10  claims.  The second step is to decide whether Insmed has made,

11  used, sold, or offered for sale within the United States a product

12  or method covered by a claim of the patent.  You, the jury, make

13  this decision.

14      With one exception, you must consider each of the asserted

15  claims of the patent individually, and decide whether Insmed's

16  product or method infringes that claim.  The one exception to

17  considering claims individually concerns dependent claims.  A

18  dependent claim includes all of the requirements of a particular

19  independent claim, plus additional requirements of its own.  As a

20  result, if you find that an independent claim is not infringed, you

21  must find that its dependent claims are also not infringed.  On

22  the other hand, if you find that an independent claim has been

23  infringed, you must still separately decide whether the additional

24  requirements of its asserted dependent claims have also been

25  infringed.  Here, claim 1 of the '287 patent is an independent

26  claim and claims 6-8 and 17 of the '287 patent are dependent on

27  claim 1.  Claim 1 of the '151 patent is an independent claim and

28

10

United States District Court

For the Northern District of California

1  claims 4 and 5 of the '151 patent are dependent on claim 1.

2      In this case, Plaintiffs have alleged that Insmed directly

3  infringes claims 1, 6-8, and 17 of the `287 patent.

4      A company directly infringes a claim if, during the time the

5  patent is in force, the company makes, uses, sells, or offers to

6  sell a product or method that meets all the requirements of that

7  claim.  To determine whether Insmed's product or method meets all

8  the requirements of the claim, you must understand the meaning of

9  the words in the claim and the requirements that those words

10  impose.  I have already explained to you the meaning of some of the

11  words of the claims in this case.  I have also explained to you

12  that other words in the claims should be given their ordinary,

13  everyday meaning.

14      To decide whether Insmed's product or method infringes an

15  asserted claim of a patent, you must compare the product or method

16  with the patent claim and determine whether every requirement or

17  limitation of the claim is included in the product or method.  If

18  so, Insmed's product or method infringes that claim.  If, however,

19  Insmed's product or method does not have every requirement of the

20  patent claim, it does not infringe.  You must decide infringement

21  for each asserted claim separately.

22                    **INDIRECT INFRINGEMENT**

23      Plaintiffs contend that Insmed has contributed to and actively

24  induced infringement by a third party of claims 1, 4 and 5 of the

25  `151 patent.  Insmed cannot contributorily infringe or induce

26  infringement unless Plaintiffs prove that a third party other than

27  Insmed directly infringes the patent by using a product that

28                              11

1  includes all the requirements of an asserted claim.  If there is no

2  direct infringement, Insmed cannot have contributed to infringement

3  or induced infringement.  In this case, Plaintiffs contend that the

4  administration of iPlex to patients directly infringes the claims

5  of the patent, and that Insmed contributes to or induces that

6  infringing act.

7        I will now explain contributory infringement and inducing

8  infringement in more detail.

9                        **CONTRIBUTORY INFRINGEMENT**

10       Plaintiffs argue that Insmed has contributed to infringement

11 by another of claims 1, 4 and 5 of the `151 patent.  Contributory

12 infringement may arise if Insmed supplied something that was used

13 to infringe one or more of the patent claims.  To prove

14 contributory infringement, Plaintiffs must persuade you that it is

15 more likely than not that a third party other than Insmed directly

16 infringed one or more of the asserted claims.  If you are so

17 persuaded, Insmed contributorily infringed if:

18       (1)  Insmed sold or supplied iPlex to a third party;

19       (2)  iPlex is not suitable for other substantial

20 non-infringing use; and

21       (3)  Insmed supplied iPlex with the knowledge that iPlex was

22 especially made for use in an infringing manner.

23                        **INDUCING INFRINGEMENT**

24       Plaintiffs have alleged that Insmed induced infringement of

25 claims 1, 4 and 5 of the `151 patent.  A company induces patent

26 infringement if it causes, urges, or encourages a third party to

27 infringe a patent.  In other words, inducing infringement cannot

28                                    12

occur unintentionally.

To prove inducing infringement, Plaintiffs must prove that it is more likely than not that the following three things happened:

First, Insmed encouraged or instructed a third party how to administer iPlex in a manner that you, the jury, find infringes the asserted claims.

Second, Insmed knew or should have known that its encouragement or instructions would likely result in the third party doing that which you find to be an infringement of the asserted patent claims; and

Third, the third party infringed the asserted patent claims.

**WILLFUL INFRINGEMENT**

Plaintiffs contend that Insmed has infringed the asserted patents willfully.  Asserting willful infringement requires a higher burden of proof than proving infringement.  To prove willful infringement, Plaintiffs must persuade you it is highly probable that Insmed had no reasonable basis for believing (1) that its alleged product or method did not infringe the patent or (2) that the patent was invalid.

In deciding whether Insmed committed willful infringement, you must consider all of the facts, which include but are not limited to:

A.   Whether Insmed intentionally copied a product of Plaintiffs covered by the patent;

B.   Whether Insmed, when it knew of Plaintiffs' patent protection, investigated the scope of the patent and formed a good-faith belief that the patent was invalid or that it was not

United States District Court
For the Northern District of California

infringed;

C.   Whether Insmed had a substantial defense to infringement and reasonably believed that the defense would be successful if litigated;

D.   Whether Insmed made a good faith effort to avoid infringing the patent; and

E.   Whether Insmed relied on a legal opinion that appeared to it to be well-supported and believable and that advised Insmed (1) that its product or method did not infringe the patent, or (2) that the patent was invalid.

### INVALIDITY -- BURDEN OF PROOF

I will now instruct you on the rules you must follow in deciding whether Insmed has proven that the asserted claims of the `414 patent are invalid.

To prove invalidity of any patent claim, Insmed must persuade you that it is highly probable that the claim is invalid.  Each claim must be considered separately.

### WRITTEN DESCRIPTION REQUIREMENT

(CLAIMS 1-4 AND 9-10 OF THE `414 PATENT)

Insmed can meet its burden of proving that a patent claim is invalid by showing that the patent does not contain an adequate written description of the claimed invention.  In the course of the prosecution of the patent application, the claims may be changed between the time the original patent application is first filed and the time the patent is finally granted.  An inventor may amend the claims in his or her original application or add new claims.  The changes may narrow the scope of the claims or may broaden their

scope.  The purpose of the written description requirement is to make sure that the inventor had in mind the invention as claimed in the issued patent, at the time the application for the patent was originally filed.  The written description requirement is satisfied if a person of ordinary skill in the field reading the patent application as originally filed would recognize that the patent application described the invention as finally claimed in the patent.  A requirement in a claim need not be specifically disclosed in the patent application as originally filed if persons of ordinary skill in the field would understand that the missing requirement is necessarily implied in the patent application as originally filed.

**ENABLEMENT REQUIREMENT**

(CLAIMS 1-4 AND 9-10 OF THE `414 PATENT)

Insmed can meet its burden of proving that a patent claim is invalid by showing that the patent does not contain a description of the claimed invention that is sufficiently full and clear to enable persons of ordinary skill in the field to make and use the invention.  This is known as the "enablement" requirement.  If a patent claim is not enabled, it is invalid.  The inventor need not demonstrate in the specification that the inventor has actually made the patented product or carried out the patented method.  It is enough if the inventor's description of the invention is sufficiently full and clear to enable persons of ordinary skill in the field to make and use the invention.

The patent is enabling if it permits persons of ordinary skill in the field to make and use the invention without having

15

to do excessive experimentation.   Some amount of experimentation
to make and use the invention is allowable.   The factors you may
consider in deciding whether the amount of experimentation
necessary to make or use the invention is excessive include:

        the time and cost of any necessary experimentation;

        how routine any necessary experimentation is in the field;

        whether the patent discloses specific working examples of
the claimed invention;

        the amount of guidance presented in the patent;

        the nature and predictability of the field;

        the level of ordinary skill in the field; and

        the scope of the claimed invention.

        Enablement is tested as of the date the original patent
application was first filed.

                    **LEVEL OF ORDINARY SKILL**

        Several times in my instructions I have referred to a person
of "ordinary skill in the field."

        The parties agree that, with respect to the '414 patent, a
person of ordinary skill in the field is a research scientist or
physician; in 1983 this person would usually have a graduate
degree, or be a graduate student in biochemistry or molecular
biology or a technician in an industrial lab, and have at least
three years of research in the field of molecular biology and/or
biochemistry, with knowledge of genetic engineering techniques,
protein chemistry, protein expression, purification and
characterization.   In addition, a person of ordinary skill in the
field would be familiar with the main publications concerning gene

United States District Court

For the Northern District of California

1  cloning, expression vectors, the expression of foreign genes in

2  bacteria and mammalian cells, and the processes and challenges in

3  recovering biologically active recombinant proteins from various

4  expression systems.

**DAMAGES**

6      I will instruct you about the measure of damages.  By

7  instructing you on damages, I am not suggesting which party should

8  win on any issue.

9      If you decide that any claim of the asserted patents has been

10 infringed and is not invalid, you must then determine the amount of

11 money damages to be awarded to Plaintiffs to compensate them for

12 the infringement.

13     The amount of the damages must be adequate to compensate

14 Plaintiffs for the infringement.  A damages award should put

15 Plaintiffs in approximately the financial position they would have

16 been in had the infringement not occurred, but in no event may the

17 damages award be less than a reasonable royalty.  You should keep

18 in mind that the damages you award are meant to compensate

19 Plaintiffs and not to punish an infringer.

20     Plaintiffs have the burden to persuade you of the amount of

21 their damages.  You should award only those damages that Plaintiffs

22 more probably than not suffered.  While Plaintiffs are not required

23 to prove their damages with mathematical precision, they must prove

24 by the more-likely-than-not standard the amount of damages they

25 have suffered as a result of the infringement.  Plaintiffs are not

26 entitled to damages that are remote or speculative.

17

**United States District Court**
For the Northern District of California

1

### REASONABLE ROYALTY -- DEFINITION

2      Damages in this case are based on what you consider to be a
3  reasonable royalty.

4      A royalty is a payment made to a patent holder in exchange
5  for rights to make, use or sell the claimed invention.   A
6  reasonable royalty is the payment that would have resulted from a
7  negotiation between a patent holder and the infringer taking place
8  at a time when the infringing sales first began.   In considering
9  the nature
10  of this hypothetical negotiation, the focus is on what the
11  expectations of the patent holder and infringer would have been had
12  they entered into an agreement at that time and acted reasonably in
13  their negotiations.   However, you must assume that both parties
14  believed that the patents were valid and infringed.   In addition,
15  you must assume that the patent holder and infringer were willing
16  to enter into an agreement; your role is to determine what that
17  agreement would have been.   The test for damages is what royalty
18  would have resulted from the hypothetical negotiation and not
19  simply what either party would have preferred.

20      In this trial, you have heard evidence of things that happened
21  after the infringing sales first began.   The evidence can be
22  considered only to the extent that it sheds light on the parties'
23  state of mind at the time of the hypothetical negotiation.   You may
24  not limit or increase the royalty rate based on the actual profits
25  that Insmed made.

26      In determining a reasonable royalty, you may consider evidence
27  of any of the following factors if you find those factors apply to

28
18

this case.   You have heard the parties' expert witnesses refer to these as the "Georgia-Pacific" factors.

> 1. The royalties received by Plaintiffs for the licensing of the '151, '287 or '414 patent, proving or tending to prove an established royalty.
>
> 2. The rates paid by Insmed for the use of other patents comparable to the '151, '287 or '414 patent.
>
> 3. The nature and scope of the license, as exclusive or non-exclusive.
>
> 4. Plaintiffs' established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
>
> 5. The commercial relationship between Plaintiffs and Insmed, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
>
> 6. The effect of selling the patented specialty in promoting sales of other products of Insmed; the existing value of the invention to Plaintiffs as a generator of sales of its non-patented items; and the extent of such derivative sales.
>
> 7. The duration of the patent and the term of the license.
>
> 8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
>
> 9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
>
> 10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by Plaintiffs; and the benefits to those who have used the invention.

19

United States District Court

For the Northern District of California

11. The extent to which Insmed has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by Insmed.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as Plaintiffs) and a licensee (such as Insmed) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee-- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention-- would have been willing to pay as a royalty, and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent licensor who was willing to grant a license.

### DUTY TO DELIBERATE

When you begin your deliberations, you should elect one member of the jury as your foreperson.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your

20

1   fellow jurors.

2
3       Do not be afraid to change your opinion if the discussion
    persuades you that you should.  Do not come to a decision simply
4
    because other jurors think it is right.
5

6       It is important that you attempt to reach a unanimous verdict
7   but, of course, only if each of you can do so after having made
8   your own conscientious decision.  Do not change an honest belief
9   about the weight and effect of the evidence simply to reach a
10  verdict.

11
                            **USE OF NOTES**
12

13      Some of you have taken notes during the trial.  Whether or not
14  you took notes, you should rely on your own memory of what was
15  said.  Notes are only to assist your memory.  You should not be
16  overly influenced by the notes.
17

18                    **COMMUNICATION WITH COURT**

19      If it becomes necessary during your deliberations to
20  communicate with me, you may send a note through the marshal,
21  signed by your foreperson or by one or more members of the jury.
22  No member of the jury should ever attempt to communicate with me
23
    except by a signed writing; and I will communicate with any member
24
    of the jury on anything concerning the case only in writing, or
25
    here in open court.  If you send out a question, I will consult
26
27  with the parties before answering it, which may take some time.

28                                  21

**United States District Court**
For the Northern District of California

You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone -- including me -- how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the Court.

## RETURN OF VERDICT

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.

United States District Court

For the Northern District of California